UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------X

HILLAIRE WOODARD,

         Plaintiff,                          <u>MEMORANDUM AND ORDER</u>

    - against -

NEW YORK HEALTH AND HOSPITALS              Civil Action No.
CORPORATION,                               CV-04-5297(DGT)

         Defendant.

-----------------------------X

TRAGER, J.:

     Plaintiff Hillaire Woodard ("Woodard" or "plaintiff")
commenced this action against her former employer, defendant New
York Health and Hospitals Corporation ("HHC" or "defendant").
Woodard seeks relief on two claims pursuant to the Uniformed
Services Employment and Reemployment Rights Act ("USERRA"), 38
U.S.C. § 4301 <u>et</u> <u>seq.</u> Woodard's two causes of action under
USERRA allege that HHC discriminated against her on the basis of
her military service and denied her appropriate reemployment
after her return from military duty. Woodard's third cause of
action alleges that HHC is overcharging her under the parties'
Military Pay Reimbursement Agreement ("the Agreement").

     HHC has filed this motion for leave to amend its answer to
add a counterclaim pursuant to Fed. R. Civ. P. 13(f), and for
summary judgment on plaintiff's three claims and HHC's own
counterclaim pursuant to Fed. R. Civ. P. 56. For the following
reasons, defendant is permitted to amend its answer to add a

counterclaim.  In addition, defendant's motion for summary

judgment is granted in its entirety.


## Factual and Procedural Background

### (1)

### Statement of Facts[1]

### A.  Woodard's Employment in HHC's Office of Accreditation and Regulatory Services

HHC is a New York City-controlled corporation whose

employees are considered City employees.  HHC first hired Woodard

---

[1] HHC argues that its statement of undisputed facts must be admitted due to plaintiff's failure to comply with Local Rule 56.1.  As the moving party, HHC properly submitted a statement of undisputed facts in numbered paragraph order, each followed by citation to admissible evidence.  Woodard's response, which consisted of an "Affirmation in Opposition," failed to comply with this procedural requirement.  See Local Rule 56.1(c) (stating that each numbered paragraph in the movant's Rule 56.1 statement of facts "will be deemed to be admitted for the purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party").

Although district courts may accept as true the statements in a movant's undisputed Rule 56.1 statement, the Second Circuit has held that courts retain the discretion to look past a party's failure to comply with the court's local rules.  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir. 2001). Therefore, "while a court 'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements, it may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement."  Id. at 73 (quoting Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 292 (2d Cir. 2000).  As such, and despite the failure of plaintiff's counsel to observe this procedural requirement, this opinion will be based on a review of the entire factual record.

as a Coordinating Manager in its Early Intervention program on
March 13, 1995. Woodard Dep. Tr. at 31; Def.'s Ex. B ("Employee
Record"). Plaintiff remained employed in the Early Intervention
program until July 3, 2000, when she was hired by Dr. Van Dunn,
M.D. ("Dunn"), Senior Vice President of Medical and Professional
Affairs at HHC, for the position of Associate Director of Health
Care Standards ("ADHCS") in HHC's Office of Accreditation and
Regulatory Services ("OARS"). See Def.'s Ex. B. Woodard's
direct supervisor in this new position was Caroline Jacobs
("Jacobs"), Assistant Vice President of Accreditation and
Regulatory Services. Woodard Dep. at 32. The position of ADHCS
is categorized by HHC as a Group 11, or managerial, title. See
Def.'s Ex. E (Letter from Caroline Jacobs to Hillaire Woodard
(Jun. 21, 2000)). Woodard served as one of four managerial-level
employees in OARS. Dunn Dep. at 13-14.

Woodard testified at her deposition that, while employed as
an associate director in OARS, she was responsible for conducting
seasonal surveys of eleven hospitals, six diagnostic treatment
centers and four long-term care facilities to evaluate their
compliance with accreditation criteria and regulatory standards.
Woodard Dep. at 32-34. This required Woodard to go to the
facilities and determine whether the facility was in compliance
with a checklist of regulatory requirements. Id. at 33. Surveys
were performed one to three times per week during survey seasons.

<u>Id.</u> at 34.

In addition, Woodard was responsible for reviewing the Quality Assurance ("QA") books prepared by each of the facilities for "upward and downward trends." <u>Id.</u> at 38. Woodard would look through these books to "see how [her] hospitals were doing." <u>Id.</u> at 37. This consisted of "highlight[ing] and address[ing] any Quality Assurance issues or discrepancies," and then providing a summary report to a supervisor. <u>Id.</u> at 37-39. Woodard attended the Quality Assurance meetings of the facilities to which she was assigned, although she did not speak at them. <u>Id.</u> at 34, 40. These meetings were conducted by HHC's Quality Assurance board to monitor facilities for "issues or potential issues that would put the hospital at risk for liability." <u>Id.</u> at 36. Woodard also prepared vendor contracts, composed a newsletter, and prepared PowerPoint presentations for board meetings, as well as other tasks focused on quality assurance and regulatory compliance. Woodard Dep. at 40-49.

**B.   HHC Military Leave Procedures**

HHC Operating Procedure No. 20-26, which governs time and leave regulations, provides that all Group 11 employees in the armed forces are "entitled to a leave of absence while engaged in the performance of 'ordered military duty,' while going to and returning from such duty and where otherwise required by law."

See Def.'s Ex. H ("OP 20-26") at 14. In addition, HHC has a separate Operating Procedure No. 20-15 which details the specific rules governing an employee's leave of absence for military duty. See Def.'s Ex. X ("OP 20-15") at 1. According to OP 20-15, "an HHC employee shall be paid his/her salary while engaged in 'ordered military duty,' and while going to and returning from such duty, not exceeding a total of thirty (30) calendar days or twenty-two (22) normally scheduled work days, whichever is greater, in one calendar year." Id. at 1. The thirty calendar days are "computed and charged against the annual balance on a day-to-day basis." Id. at 4 (emphasis in original). However, when calculating the twenty-two workdays of military leave, "only those hours the employee is actually absent from the normal workday are to be charged against the [employee's] hourly bank." Id.[2] Mondo Hall ("Hall"), Associate Director for Employee Benefits, testified that under this policy, employees on military leave receive their HHC salary and their military salary for the twenty-two workdays or thirty calendar days of leave. Hall Dep. at 14. According to OP 20-15, "ordered military duty shall be charged against the annual balances on both a calendar-day and workday basis until both the 30 calendar-day entitlement and the

---

[2] The 22 workdays are computed "by multiplying the 22 workdays by the number of hours in the normally scheduled workday of each employee-reservist." The hours missed each workday for military service are then subtracted from this bank. Def.'s Ex. X at 4.

22 normally scheduled workday entitlement have been exhausted."
Def.'s Ex. X at 4.  After this paid military leave entitlement is
exhausted, an employee can use other available leave time (such
as vacation days) or unpaid days off for additional military
leave.  Hall Dep. at 15-17.

## C.   Woodard's Leaves of Absence Prior to September 2001

In November of 1986, prior to beginning her employment with
HHC, Woodard joined the United States Army Reserves.  Woodard
Dep. at 21.  She has attained the rank of major in the 1398th
Deployment Support Brigade.  Compl. ¶ 7.  As a member of the Army
Reserves, Woodard was required to participate in one weekend of
military training per month, and a minimum of fourteen days of
active duty each calendar year.[3]  Reservists can also be called
upon at any time to perform military service in addition to their
minimum requirements.  Woodard Dep. at 60-62.  Woodard performed
her obligatory military service each year while employed by HHC.
Id. at 59.  The only other HHC employee Woodard could identify as
a reservist was Dr. Consuelo Dungca ("Dungca"), the Senior
Assistant Vice President of Clinical Affairs.  Id. at 58.

At the time that Woodard interviewed with Jacobs for the
position of ADHCS, she informed Jacobs that she was a member of

_____

[3] Woodard testified that a calendar year for the Army
Reserves begins in October and ends in September.  Woodard Dep.
at 50.

6

the Army Reserves and that "she had been ordered to military leave in July of 2000." Jacobs Dep. at 10, 19. Woodard was hired for the position on July 3, 2000. She took a three week leave of absence to perform military service that same month.

In January of 2001, Woodard requested one week of military leave. At the time, Woodard was pregnant. Woodard testified that Jacobs seemed "confused" about Woodard going on military leave while pregnant. Woodard Dep. at 51. Jacobs testified that she was "trying to understand and get a better handle on the frequency with which [Woodard] might be called to leave." Jacobs Dep. at 21. Jacobs stated that this leave did not cause problems or hardship in OARS. Id. at 22.

On January 4, 2001, Woodard submitted a request to HHC for child care leave under the Family and Medical Leave Act ("FMLA") to Gloria Velez ("Velez"), Senior Director of Human Resources Services, for the period of February 21, 2001 through September 3, 2001. Def.'s Ex. K (Request for Leave Under the Family Medical Leave Act (Jan. 4, 2001)). This request was granted on March 6, 2001 by Hall. Def.'s Ex. L (Letter from Mondo Hall to Hillaire Woodard (Mar. 6, 2001)). Woodard returned to work from her six-month leave of absence on September 4, 2001. Def.'s Ex. B.


**D.  Woodard's Deployment After September 11, 2001**

On September 11, 2001, one week after Woodard returned to work at HHC, the World Trade Center and the Pentagon were struck by acts of terrorism. That same day, Woodard volunteered for military service. Woodard Dep. at 65. On September 13, 2001, Woodard informed Jacobs that she had been put on alert, meaning that "we could leave at any minute." Id. at 52. In response, Woodard testified that Jacobs "screamed at me [over the phone] that this is going to mess up her scheduling" of the surveys. Id. Jacobs also said to Woodard that "you just got back." Id. at 53. Woodard never discussed the incident with Jacobs, but Woodard claimed that "it was clear how [Jacobs] felt," and that Jacobs "was pissed off that I was leaving" because of Woodard's military obligation. Id. at 56.

At her deposition, Jacobs acknowledged that she was "shocked" to hear that Woodard was going off to war, because "[t]his is a lady who just had a baby, new family, going in to four years of unforeseen whatever. We didn't know what was happening back then, so I don't think any of us were particularly happy about that. I think it was kind of scary, to tell you the truth." Jacobs Dep. at 35. Jacobs also said that the staff of OARS had grown accustomed to the extra workload that would result from Woodard's military leave as a result of her six-month FMLA leave. Jacobs stated that "we had been, for quite some months, doing what we were doing and plodding along and we just plodded

along some more.  So it wasn't any big difference between what we had just had to do when she was on FMLA."  Jacobs Dep. at 35.  On October 22, 2001, plaintiff went on military leave.  Def.'s Ex. B.

**E.   Woodard's 2001 Job Evaluation**

One of Jacobs' responsibilities as Woodard's direct supervisor was to complete an employee evaluation of Woodard's performance as ADHCS.  Jacobs Dep. at 15.  The purpose of the evaluations is to provide employees with "an overall comprehensive picture of that person's performance."  Id. at 24.  HHC employee evaluations are typically prepared annually in July or August, and are based on the employee's performance over the previous twelve months.  Id. at 16.

Woodard's evaluation was filled out by Jacobs on September 28, 2001.  Woodard's evaluation only covered the period from July 5, 2000 to February 16, 2001, and did not include the time that she was on FMLA leave.  Woodard went on military leave twice within the evaluation period.  Jacobs Dep. at 19; Def.'s Ex. N (Managerial Performance Appraisal).  Jacobs testified that Woodard received a six-month evaluation, rather than an annual evaluation, "because Hillaire had not been on active employment during the entire 12 month period, so there was a limited time frame in which we could do an evaluation for her work

9

performance."  Jacobs Dep. at 18.

Woodard received an overall evaluation rating of "satisfactory" from Jacobs.  She received a "satisfactory" rating for each of her six major job responsibilities, and a "satisfactory" rating for all but one of the applicable "supervisory managerial abilities" and "personal attributes." Woodard's "initiative" was rated as "marginal" by Jacobs.[4] Def.'s Ex. N at 2-8.  In a handwritten note in the section entitled "Justification for Overall Rating," Jacobs wrote the following: "Due to leaves (military and FMLA) Ms. Woodard could not complete a full year in her current position nor perform all tasks for which she would be evaluated.  For this reason, we will re-evaluate Ms. Woodard's performance in six months at which time a more comprehensive appraisal should be possible."  Id. at 11.

Jacobs testified that the purpose of the handwritten note was "to provide clarification for the time frame that the evaluation was written for, and to explain, to provide more information as to the overall rating."  Jacobs Dep. at 23.  In her deposition, Jacobs denied that Woodard's military service impacted the results of the evaluation, or Jacobs' ability to evaluate Woodard.  Id. at 24-25.  Instead, Jacobs testified that the statement "merely states [] that there was a period of time

---

[4] Jacobs' comment next to this rating stated that Woodard "[n]eeds to demonstrate more initiative, willingness to self-start."  Def.'s Ex. N at 8.

10

that she was not in the department.  For the time that she was in
the department, her performance was rated based on what she
delivered and based on what we observed."  Id. at 25.

Woodard takes a very different view of the mention of her
military service in the evaluation.  Despite receiving a rating
of "satisfactory" in all but one section, and an overall rating
of "satisfactory," Woodard claims that the mention of her
military service was "a negative factor as far as they are
blaming something on my military leave."  Woodard Dep. at 90.
Woodard testified that the evaluation was "negative" because she
was being "penalized for being on military leave."  Id. at 93.
According to Woodard, "the military issue was an issue if it
wasn't it wouldn't be there" in the evaluation.  Id. at 91.
Woodard asserts that the majority of her leave during the
evaluation period was her family medical leave, and there was no
reason for her military service to be raised in the evaluation.
Id. at 93.  In addition, Woodard testified that her military
leave should not have been considered at all because military
leave "is not counted.  You are in the same position whether or
not you are there."  Id. at 89-90.

Woodard claims that Jacobs' reference to Woodard's military
leave in the evaluation, combined with Jacobs' comments regarding
Woodard's military duty and leave obligations, are evidence of
bias against her military service.  Id. at 56-57.  Woodard also

believes that Jacobs "had issues with [her] military service which she portrayed" to Dunn, and which had an impact on Dunn's decision to deny Woodard a full 8% pay increase. <u>Id.</u> at 86.

**F.    Woodard's 2001 Pay Increase**

On September 20, 2001, HHC implemented Personnel Order HHC 01/15, which detailed the eligibility requirements for a salary increase. Def.'s Ex. O (Internal HHC Memorandum from Senior VP-Operations Frank J. Cirillo (Sept. 20, 2001)). The Order applied to Group 11 employees "who on the date of this order are in active pay status and who on June 30, 2001 were in active pay status in covered titles." <u>Id.</u> The Order stated that qualified employees "whose FY 2001 performance is at least Satisfactory, shall receive a salary increase of 8.0 percent effective July 1, 2001, to be calculated on their June 30, 2001 salary. Network and Central Office Senior Vice Presidents may, at their discretion, reduce the percentage increases for their direct reports." <u>Id.</u> The Order further provided that "an employee who was on authorized leave of absence without pay from a 'covered title' on June 30, 2001, or the date of this order is eligible to receive a salary increase effective on the date of the employee's return to active pay status, in accordance with this order. Such employee shall not receive any increase for the period when the employee was on a leave of absence." <u>Id.</u> All salary adjustments

resulting from the Order were to take effect on the October 12, 2001 payroll. Id.

In a memorandum dated September 27, 2001, Dunn informed Velez that "aside from her two leaves of absence, Ms. Woodard has only worked for six months in the Office of Accreditation and Regulatory Services, not providing adequate time to appropriately evaluate her performance. Thus, I am requesting that only a 4% increase is given to Ms. Hillarie [sic] Woodard. In six months we will re-evaluate the provision of the remaining 4% based upon the results of her one-year evaluation." Def.'s Ex. P (Letter from Van Dunn to Gloria Velez (Sept. 27, 2001)). This salary increase raised Woodard's annual salary from $75,750 to $77,740. Decl. of John Yan, dated March 12, 2007 ("Yan Decl.") at ¶ 3. Dunn's letter also specified that Jacobs was to inform Woodard of this decision.

Jacobs did in fact inform Woodard that she would not receive the full 8% raise because Dunn believed that Woodard was not in her position for a year, and that she would receive the rest of the raise in six months after completing a full year of work. Woodard Dep. at 73. Woodard testified that she responded to Jacobs by informing her that she had served in her position for over a year, but that Jacobs said "no, you were not, you were on military leave and FMLA, so you were on child care leave, so you were not in that position for a year." Id. Woodard responded

13

that her military leave should not be held against her in calculating her length of employment with HHC. Id. at 73.

Jacobs stated at her deposition that the decision to give Woodard a 4% raise was "purely up to Dr. Dunn" and that she played no role in making this decision. Jacobs testified that the only time she spoke to Dunn about Woodard's raise, Dunn informed her of his decision but "did not go into detail" as to why Woodard would not receive 8%. Jacobs Dep. at 28.

Dunn himself testified that the decision was made because Jacobs informed him that Woodard had not worked a full year due to her child care leave. Dunn Dep. at 18. He claimed that he found out about Woodard's military leave only after the salary increase decision was made, when he received Woodard's six-month evaluation referencing her absence due to military service. Id. at 17.[5] Dunn also said at his deposition that Jacobs never previously mentioned to him that Woodard had been on military leave. Id. at 18. However, this testimony seems to be contradicted by Dunn's September 27, 2001 memorandum, which referenced Woodard's "two leaves of absences" when explaining her 4% pay increase. Def.'s Ex. P. Construing all inferences in favor of plaintiff, this reference to "two leaves of absences"

_____

[5] Jacobs' evaluation of Woodard was dated September 28, 2001, and so would have been submitted to Dunn after he sent out the September 27, 2001 memorandum announcing Woodard's 4% pay increase. See Def.'s Ex. N.

suggests that Dunn was aware of both Woodard's military and FMLA leaves when the pay decision was made.

Woodard appealed Dunn's decision to Beverly Lewin ("Lewin"), Deputy Directory of Human Resources Services for HHC. At their meeting, Woodard explained what Jacobs had told her regarding why she received only a 4% raise. Woodard also informed Lewin that she believed the real reason she received only 4% was her military leave, particularly her state of alert after September 11, and that Jacobs was angry at this fact and yelled at her. Woodard Dep. at 54. Lewin told Woodard that she did not receive the 8% increase because she was not in her position for a year due to her leaves of absence.[6] Woodard Dep. at 78.

## G. Woodard's Military Leave After September 11, 2001

After volunteering for active duty on September 11, 2001, Woodard was ordered to begin military duty on October 22, 2001. Her request for military leave was granted by HHC. Def.'s Ex. W (Letter from Gloria Velez to Caroline Jacobs (Oct. 18, 2001)). According to the then-current military leave policy, Woodard was only entitled to twenty-two workdays or thirty calendar days of paid military leave. If Woodard remained on leave beyond the

---

[6] With regard to the explanation Woodard was provided for why she did not receive the full 8% raise, Woodard asserts that Lewin mentioned her military and FMLA leave. Woodard testified that "if Caroline Jacobs said it to me, Beverly Lewin said it to me." Woodard Dep. at 78.

paid entitlement period, she could use up her accrued annual leave to continue receiving a salary. Once her annual leave was used up, her time sheets were to be coded as "without pay." See Def.'s Ex. X.

HHC's policy governing military leave underwent significant change on November 1, 2001. By memorandum on November 1, 2001, Nancy Doyle ("Doyle"), Assistant Vice President for Workforce Planning and Development, informed HHC Human Resources Directors that, effective September 11, 2001, HHC would be "granting additional benefits" to employees engaged in ordered military duty in connection with Operation Enduring Freedom. In addition to the paid military leave entitlement provided for in OP 20-15, these employees would "remain on payroll in active status for as long as they are on ordered military duty in connection with the events of September 11, 2001."[7] Def.'s Ex. Y (Nancy Doyle Memorandum (Nov. 1, 2001)) at 1. HHC's "additional benefits" policy was part of New York City's Extended Military Benefits Package ("EMBP"), enacted in October of 2001 as "a voluntary program that allows City reservists to continue to receive the City's salary and benefits when they are called to active military duty for more than 30 calendar days or 22 working days."

_____

[7] In addition, these employees "will continue to accrue annual leave and sick leave, which will be credited upon their return to work. They will continue to receive full health insurance benefits and the Corporation will continue to make welfare fund contributions on their behalf." Def.'s Ex. Y at 1.

Pl.'s Ex. 5 (New York City press release (Nov. 10, 2006)).

In exchange for these additional benefits, the new policy provided that employees on ordered military service "will be required to remit to the Corporation an amount equal to the amount received in military pay for any days in excess of the statutory entitlement of thirty calendar days or twenty-two workdays."[8]  Def.'s Ex. Y at 1-2.  The amount of money owed to HHC was to be sent within thirty days after the completion of ordered military service.  Id. at 2.  In order to be eligible for these additional benefits, HHC required that the employee "agree, in writing, to this reimbursement" policy.  Id.

While serving ordered military duty, Woodard was informed of this change in HHC's military leave policy.  On November 19, 2001, Woodard executed her Military Pay Reimbursement Agreement ("the Agreement").  It provided that, "[i]n consideration of the payment to me by the Health and Hospitals Corporation of my full salary and benefits while I serve on ordered military duty...in conjunction with the events of September 11, 2001, I agree that I shall remit to the New York City Health and Hospitals Corporation an amount equal to the amount I receive in military pay*[9] or HHC

---

[8] If an employee's military pay was greater than his/her HHC salary, the employee was required to remit to HHC an amount equal to the HHC salary.  Def.'s Ex. Y at 2.

[9] The asterisk indicated that "[m]ilitary pay is defined as the amount of base pay plus allowances for food and shelter."  Def.'s Ex. Z.  As explained below, "military pay" was later

17

salary, whichever is less, for any days in excess of the statutory entitlement of thirty calendar days or twenty-two work days within thirty days after the conclusion of ordered military leave."  Def.'s Ex. Z.

On December 31, 2003, Nancy Doyle sent a memorandum to Human Resources Directors and Payroll Directors reminding them of the "additional benefits" granted to HHC employees serving on ordered military leave in connection with the events of September 11, 2001.  The memorandum specified the three repayment options available to returning employee service-members.  HHC employees who signed a Military Pay Reimbursement Agreement could repay the full amount owed through certified check or money order; repay through charges to their annual leave balance; or repay through payroll deductions (not to exceed 10% bi-weekly gross pay) over an extended period.  Def.'s Ex. BB (Nancy Doyle Memorandum (Dec. 31, 2003)).  A similar memorandum specifying the three repayment options was sent By John K. Yan ("Yan"), Director of Corporate Payroll Operations, to HHC Payroll Managers on January 9, 2004.  Def.'s Ex. CC (John Yan Memorandum (Jan. 9, 2004)).

## H.   Woodard's Return to Work at HHC

On February 29, 2004, after being on active duty for nearly

---

redefined by the City to exclude the food and shelter allowances.  See Pl.'s Ex. 5.

two and a half years, Woodard sent a letter to HHC Human
Resources to notify HHC that she had been discharged and to
request a return to work.  Woodard asked "to be returned to duty
at NYC HHC, 93 Worth Street (Early Intervention) or NYC HHC 125
Worth Street" beginning on March 29, 2004.  Def.'s Ex. DD (Letter
from Hillaire Woodard to Beverly Lewin (Feb. 29, 2004)).  The
reference to "125 Worth Street" appears to refer to her old job
at OARS, which was located at that address.

Woodard testified that she was initially told to report to
Meryl Weinberg ("Weinberg") in HHC's Health and Home Care
program, although Woodard did not say who gave her this
assignment or when she received it.  Woodard Dep. at 98-100.
Woodard says she contacted Weinberg before her start date to
inquire about her duties and responsibilities, and that Weinberg
said she would "be assigned to support staff," and that her hours
would be 9:00 a.m. to 5:00 p.m.  Id. at 99.  Woodard testified
that she told Weinberg, "I am not a support staff, I am a
manager."  Id. at 100.  Woodard also told Weinberg that her hours
had always been 8:00 a.m. to 4:00 p.m.  Id.  Woodard testified
that Weinberg said she would be in touch with Woodard, but that
she was never contacted by Weinberg again.  Id.

Instead, the record shows that on March 5, 2004, Human
Resources Director Velez sent Woodard a letter approving her
request to return to work, and instructing Woodard to return to

her prior position as Associate Director of Health Care Standards in OARS. Def.'s Ex. EE (Letter from Gloria Velez to Hillaire Woodard (Mar. 5, 2004)). Jacobs also initially believed that Woodard would be returning to her old job, which had remained unfilled throughout Woodard's military leave of absence because Woodard "was active." Jacobs Dep. at 33. Jacobs had filled out internal paperwork to request that Woodard return to OARS. Id. at 36-37. Jacobs and other OARS employees also arranged for Woodard's old office to be cleaned and looked into obtaining a new computer for her in preparation for her return. Id.

However, an e-mail message from Dunn to Woodard on March 24, 2004, told Woodard instead to report to Dr. Dungca in the Quality Management and Clinical Affairs area ("QMCA") of the Division of Medical and Professional Affairs. Def.'s Ex. FF (E-mail from Van Dunn to Hillaire Woodard (Mar. 24, 2004)). QMCA is the division responsible for HHC's Quality Assurance Committee ("QAC"). The QAC provides oversight to HHC facilities (including eleven hospitals, six diagnostic and treatment centers and long-term care facilities) by monitoring healthcare performance data, such as information about patient morbidity and mortality. Dunn Dep. at 23. In addition, the QMCA office is responsible for monitoring HHC's clinical initiatives to improve the quality of care at its facilities. For example, QMCA is responsible for HHC task forces acting to reduce pulmonary emboli, deep vein

thrombosis, bed sores and other patient care problems.  Id. at
24.  Dunn described Woodard's new role in this office as "a very
critical position for the corporation and for quality assurance."
Id. at 27.

Dunn decided to send Woodard to QMCA because she was a
qualified employee with experience in quality assurance issues,
who could fill a crucial role in an understaffed office.  See
Dunn Dep. at 23 ("I have a very big division, and there were
crucial needs in other divisions and I felt that her performance,
that she could easily work in those divisions and make a valuable
contribution.").  Dunn stated that Dungca "was down three
[employees] and because we were on a very tight budget, we were
not able to fill the positions, and so this gave me an
opportunity to take a position and move it in to her division."
Id. at 24; see also Dungca Dep. at 8.  In contrast, Jacobs had
never asked Dunn to hire a replacement to fill Woodard's spot,
either on a permanent or temporary basis.  Instead, the remaining
employees in OARS had successfully managed to take care of
Woodard's responsibilities while she was on leave, without any
complaints.  Dunn Dep. at 14-15.

Jacobs confirmed this account at her deposition.  Jacobs
testified that at the time Woodard was reinstated, HHC was
"looking at head count very carefully and people were being moved
around."  Jacobs Dep. at 37.  Jacobs spoke to Dunn about his

decision to move Woodard to QMCA, stating that "I wanted to know why she was being moved, and everyone--there were vacancies in the division, and it was his choice as the senior manager in the division to reallocate staff as he deemed necessary, and that's what he deemed necessary." Id. at 41. According to Jacobs, Woodard's old position in OARS ceased to exist once Woodard began work at QMCA because it had been held open specifically for her. Id. at 38.

## I.    Dispute Over Woodard's New Job Responsibilities

Woodard reported for work to Dr. Dungca in QMCA on March 29, 2004. She retained the title and managerial rank of Associate Director for Health Care Standards, now in the area of quality assurance rather than accreditation and regulatory services. Def.'s Ex. B; Woodard Dep. at 105. Woodard initially received the same salary of $77,740 per year that she received prior to her military service. Def.'s Ex. B.

Before Woodard began her new job at QMCA, Dunn asked Dungca to compose a job description that identified Woodard's duties and responsibilities. Dunn Dep. at 25. Dungca developed a "functional" job description of Woodard's position and job responsibilities sometime in March of 2004 before Woodard reported for work. Dungca Dep. at 14-15. Some of the responsibilities listed included managing quality assurance

information; attending the QAC meetings; managing attendance and the taping of presentations; organizing and transcribing the minutes of the QAC meetings; monitoring and submitting the minutes to supervisors and the facilities for review; creating the quarterly reports; preparing the Annual QAC Report for the HHC Board; communicating with facilities' QA coordinators on report data; and managing the Child Health QA Reports. Def.'s Ex. GG. In addition to these quality assurance activities, the job included data management responsibilities such as extracting data on asthma and psychiatric readmissions for quarterly reports; collecting statistics on Child Health Centers; providing HHC-wide data trend analysis; presenting and aggregating data for presentations; and developing statistical reports as needed. Id. On March 29, 2004, the day Woodard returned to HHC, she reviewed and signed the Functional Job Responsibilities form. Id.

Three individuals provided on-the-job training to Woodard: Dungca herself, Marilyn DeOcampo ("DeOcampo"), and Marlene Allison. Dungca Dep. at 12. Until 2002, DeOcampo served as an Executive Secretary in QMCA assisting Esther Schwartz ("Schwartz"). DeOcampo testified that Schwartz's position was a "managerial" position, with a title of "senior management consultant," and that Schwartz worked "right under" Dungca, the Senior Assistant Vice President of Clinical Affairs. DeOcampo Dep. at 11, 16-17. DeOcampo testified that Woodard replaced

Schwartz when Woodard joined QMCA in March of 2004. Id. at 10.
Dungca instructed DeOcampo to give Schwartz's responsibilities to
Woodard, including attending the QA meetings; recording,
transcribing, and reviewing the minutes; and preparing the
quarterly board report. Id. at 12-14.

Woodard acknowledges that OARS and QMCA have "similar"
functions that "overlap." Woodard Dep. at 106. However, Woodard
claims that the new position was effectively a demotion from her
former responsibilities. Woodard complained to Hall, the
Benefits Coordinator for HCC, that managers do not take minutes,
and that she was the "highest paid secretary in New York." Id.
at 107. Woodard, however, never complained about her
responsibilities to Dungca directly. Id. at 108. There is also
no evidence that Woodard complained to Dunn about her
reassignment.

Woodard alleges that her duties and responsibilities
differed upon returning from military service because HHC, and
Dr. Dunn in particular, wanted to "penalize" her for going on
military leave by giving her work that was "beneath" her. Id. at
106. She testified that "I guess too that [HHC believed] I would
quit after being bored by flipping cassettes and typing minutes
or it was their way of forcing me out." Id. Woodard
acknowledged that Dunn himself never communicated to her that he
was upset about her military leave, and that her belief was based

24

upon her 2001 conversation with Jacobs regarding her 4% salary raise.  Id. at 109.  Nobody at HHC ever spoke to Woodard about Dunn's opinion of her or her military service.  Id. at 110.

Woodard also alleges that her marketability to potential employers was reduced by her change in responsibilities.  She claims that if an employer asks her what tasks she performed at her previous job, and she responds that she was responsible for "typ[ing] the minutes [and] changing cassettes," then she "will probably get an administrative assistant position" rather than a managerial position.  Id. at 161.  Woodard testified at her deposition that she had not looked for a new job since ending her employment with HHC.  Id.  She maintained that she was "too afraid to look for a job yet" because employers would "laugh [her] out of the marketplace" based on her responsibilities while in QMCA.  Id. at 162.

HHC disputes Woodard's characterization of her role in QMCA. Dunn testified at length about the critical nature of Woodard's position at QMCA:

> The [quality assurance committee meeting] minutes are
> not a word to word transcription of what is said.  The
> reason why we have a professional transcribing the minutes
> is not because we need a word-for-word description of what
> happened.  We want a synopsis of what were the issues, how
> did the facility respond, what are the follow-up actions
> that need to be made.  So you have the person who is
> actually going to go through and listen to the minutes as a
> professional, because they got to be able to decipher what
> are quality issues, what are health care issues, what are
> utilization issues, and you can't have a secretary do that.
> If you wanted a transcription where they had word-for-

25

> word, then you can have a secretary, but then you would have
> to have a professional then sit down and go through the
> word-for-word transcription of the meeting to then put it in
> a form that is actionable, and a secretary can't do
> that. . . .
>
> So her job was critical from the standpoint of being a
> professional and being able to listen to an hour tape by
> medical directors, by department chiefs, by members of the
> board of directors and making sure that the minutes
> reflected what went on in the meeting, not a word-for-word
> account of what happened in the meeting.

Dunn Dep. at 28-29. Although Woodard has complained that this

job involved no analytical work, Dunn explained that an

analytical background was necessary so that the person preparing

the minutes could understand and respond to the substance of the

quality assurance meetings. Id. at 32. Significantly, when

Woodard left QMCA for another period of leave, Dunn filled the

position with Dr. Charles Nocovich, a nurse with a Ph.D. degree.

Id. at 27.[10]

Woodard's co-workers at QMCA also attested to the managerial

nature of this position. Dungca testified that Woodard's

position was a managerial position because "the work she is doing

is highly confidential and only a manager can do it." Dungca

Dep. at 33. Dungca explained that Woodard was responsible for

"doing the management part of processing quality management

activities," which included processing the Quality Assurance

books, taping the meetings of the QA committee, and transcribing

---

[10] Dunn also testified that "Woodward was clearly qualified
and during the time that she did [the minutes], she did a very
good job." Dunn Dep. at 29.

the minutes of the meetings.  <u>Id.</u> at 8-9.  Dungca testified that
only managerial staff members were responsible for these
activities.  Dungca also noted that Woodard shared the
responsibility for transcribing minutes with three other people,
including Dungca herself, an assistant director from the QMCA
office and a systems analyst.  <u>Id.</u> at 10-11.  <u>See also</u> DeOcampo
Dep. at 15 ("Everybody was doing transcription.").

DeOcampo confirmed that preparing minutes from the QA
meetings was a "managerial" task, and that attending the meetings
was a managerial "privilege."  DeOcampo testified that the
meetings are "confidential" because "you're there with all the
senior staff of the corporation."  DeOcampo Dep. at 19.  Although
Woodard claimed that she was "sitting with the other secretaries
taking minutes where I sat with the managers before" at the QAC
meetings, Woodard Dep. at 98, DeOcampo indicated that "no
secretaries attend those meetings," DeOcampo Dep. at 18-19.

**J.    Retroactive Pay Increase to 2001**

Following Woodard's return to HHC in March of 2004, she
received a 4% raise from $77,740 to $80,850.  Def.'s Ex. B.  This
4% represented "the balance of the 8% raise."  Yan Decl. at ¶ 4.
The raise was implemented retroactive to September 4, 2001 – the
date upon which Woodard returned to work after her family medical
leave.  Def.'s Ex. B.  Woodard received this raise – the balance

27

of the September 2001 salary increase - despite not receiving a one-year evaluation with a "satisfactory" rating. Dunn said at his deposition that he would have signed off on this pay increase. Dunn Dep. at 21.

Woodard requested that she be paid the $8,266.38 in back pay she was owed in an e-mail to Hall on August 2, 2004. Def.'s Ex. QQ (E-mail from Hillaire Woodard to Mondo Hall (Aug. 2, 2004)). HHC's pay records show that Woodard received the back pay she was owed. Yan Decl. at ¶ 4 & Ex. 1.

## K. Dispute Over Repayment of Military Leave Pay

On March 29, 2004, the day that Woodard returned to work following her extended military leave, she received a letter from HHC's benefits department reminding her of the terms of the Agreement. Def.'s Ex. LL (Letter from Mondo Hall to Hillaire Woodard (Mar. 29, 2004)). The letter also informed Woodard of the three repayment options. Woodard does not deny that, pursuant to the Agreement, she owes HHC some money. Woodard Dep. at 145. However, Woodard and HHC disagree as to the amount owed. The conflict centers on the interpretation of the phrase "for any days" in the following statement: "I agree that I shall remit to the New York City Health and Hospitals Corporation an amount equal to the amount I receive in military pay or HHC salary, whichever is less, _for any days_ in excess of the statutory

entitlement of thirty calendar days or twenty-two work days within thirty days after the conclusion of ordered military duty."  Def.'s Ex. Z (emphasis added).

Woodard maintains that she understood the word "days" to refer to "work days" (that is, a seven-hour day during the five-day work week).  She testified that she concluded that the word "days" meant "work days" because she was only "charged" work days when HHC calculated the length of her prior military leaves. Woodard Dep. at 138.  She admits that she did not discuss the meaning of the Agreement with anyone prior to signing it.  Id. at 140.

On March 31, 2004, HR Director Velez sent a letter to Payroll Director Yan indicating that Woodard was interested in the payroll deduction repayment option.  The letter also informed Yan that Woodard had some concerns regarding differences between her military pay and her HHC pay, and requested Yan's "assistance in clarifying these questions/concerns."  Def.'s Ex. MM (Letter from Gloria Velez to John Yan (Mar. 31, 2004)).  Attached to the letter were charts containing Woodard's own calculation of the amount of military pay she owed HHC.  Woodard's calculations were based on her assumptions that (1) the military paid her to work twenty-four hours a day and seven days a week; (2) she could calculate her military salary as an hourly wage based on that 24/7 work schedule; and (3) she only needed to repay HHC for the

wages she earned, based on that purported hourly wage, during her
usual thirty-five hour work week.  Based on this formula, Woodard
concluded that she owed HHC $60,522.24.  Id.  Woodard later
claimed that this figure should "be a lot less" because she was
later informed that HHC would only seek to recoup base pay, not
housing and food allowances.  Woodard Dep. at 167.

Yan responded by e-mail on May 3, 2004, stating that "HHC
pay is based on calendar day.  Each employee's bi-weekly pay is
based on his/her annual salary divided by 365 calendar days per
year and then multiplied by 14 calendar days in pay status per
period."  Def.'s Ex. NN.  Yan's e-mail informed Velez that HHC's
own calculation of the amount owed by Woodard "will be calculated
for all calendar days paid on and after 11/25/01," when her paid
military leave entitlement expired.  Id.  Woodard said at her
deposition that she was unaware that her HHC salary was broken
down by calendar days.  Woodard Dep. at 142.

On July 7, 2004, Yan informed Velez that he had calculated
that Woodard owed $137,052.97 to HHC.[11]  Included with Yan's
letter was "a worksheet showing the monies in basic military pay
received by Ms. Woodard during this period as compared with the

---

[11] Yan's initial calculation credited Woodard for two
separate periods of thirty calendar days where she could receive
both HHC and military salary.  As noted below, HHC later amended
this calculation, because it was not required to pay Woodard for
thirty days of military leave each year when she was on a
continuous period of military service.

HHC salary she received for the same period." Def.'s Ex. OO.
Yan's figure did not include the amount Woodard owed for housing
or food allowances. Id.

Woodard initially suggested to Hall, who worked in HHC's
benefits department, that she wanted to repay HHC through the
payroll deduction option. Woodard also indicated that she wanted
to apply the $8,266.38 in back pay she was owed by HHC towards
the $137,052.97 recoupment amount. Def.'s Ex. P (Status Sheet of
Meeting Between Hall and Woodard (7/28/04)); Def.'s Ex. QQ (E-
mail from Hillaire Woodard to Mondo Hall (Aug. 2, 2004)).

On August 23, 2004, Hall asked Yan to begin deducting 10% of
Woodard's bi-weekly gross salary. Def.'s Ex. RR (Letter from
Mondo Hall to John Yan (Aug. 23, 2004)). That same day, Hall
informed Woodard that, pursuant to the Agreement, he had given
authorization to Corporate Payroll Operations to begin deducting
10% of her bi-weekly gross salary "for repayment towards extended
military benefits [] received." Hall also requested that Woodard
"provide us with [a] decision on making additional payments
through other options." Hall included a copy of the Agreement in
his correspondence to Woodard. Def.'s Ex. SS (Memorandum from
Hall to Woodard (Aug. 23, 2004)).

Woodard responded to Hall on August 26, 2004 by e-mail.
Woodard stated that "I have concluded that I am not in agreement
with the Corporation mentioned sum of $137K+. Therefore, I

31

cannot give you a repayment plan." Def.'s Ex. TT (E-mail from Hillaire Woodard to Mondo Hall (Aug. 26, 2004)). On August 27, 2004, Hall asked Woodard to provide HHC with "a detailed list of whatever discrepancies you have" with HHC's calculation of the amount owed. Hall also reminded Woodard that, pursuant to the Agreement, Corporate Payroll was authorized to deduct 10% from her bi-weekly gross salary and to put it towards repayment. Def.'s Ex. TT (E-mail from Mondo Hall to Hillaire Woodard (Aug. 27, 2004)).

As of June 17, 2005, the recalculated amount of money owed by Woodard to HHC, pursuant to the Agreement, totaled $146,771.32. This amount represents $144,141.98 in basic military pay that Woodard received while on military leave from November of 2001 through February of 2004, plus $6,213.25 "in extended military benefits overpaid" to Woodard, less $3,583.91 recouped through payroll deductions. Yan Decl. at ¶ 5. The revised figure does not take into account Woodard's housing or food allowances while on military leave. Id. at ¶ 6.

## L.    Woodard Ends Employment With HHC

After Woodard started the QMCA job on March 29, 2004, she took an additional military leave for the last week of June and the first week of July. Woodard also took two separate one-week military leaves in August of 2004. Woodard Dep. at 123-24.

On August 28, 2004, Woodard went on FMLA leave for a
hysterectomy.  She remained on FMLA leave until November 7, 2004
but did not return to work on this date.  Id. at 124.  Instead,
Woodard went on a 179-day tour of military duty in Alexandria,
Virginia beginning on November 8, 2004.  Id. at 125.[12]  Woodard
was informed that while she was on military leave, she could take
an extended military leave of absence without pay, or sign
another Military Pay Reimbursement Agreement.  Pl.'s Ex. UU
(Letter from Mondo Hall to Hillaire Woodard (Nov. 3, 2004)).
Woodard did not sign another Military Pay Reimbursement Agreement
for this leave.  Woodard Dep. at 171.  Following this period of
military service, Woodard never returned to work at HHC.  Woodard
says that she received a letter from HHC in July of 2005
informing her that her "services were no longer required."  Id.
at 148.


## (2)

### Procedural History

Woodard commenced this action on December 6, 2004, alleging
three causes of action, the first two of which are grounded in
USERRA.  First, Woodard alleges that she was discriminated

---

[12] Woodard's Employee Record indicates that on November 8,
2004, HHC placed Woodard on annual leave, which was to last until
January 11, 2005.  Her Employee Record indicates that from
January 11, 2005 to July 7, 2005 she was coded as absent on
military leave without pay.  Def.'s Ex. B.

against by HHC based on her military service "in the form of reduced pay increases and negative personnel evaluations." Compl. ¶ 17. Second, Woodard claims that, upon her return to HHC from two and a half years of military service, HHC "removed her from all her managerial functions and assigned her to secretarial functions." She alleges that this "demotion in the nature of her duties" resulted in a loss of status which "has had and will continue to have a detrimental effect on Plaintiff's ability to be promoted by the Defendant," and "reduced the Plaintiff's marketability for jobs outside of the Defendant's agency." Id. ¶¶ 30-31. Lastly, Woodard alleges that the term "any days" in the Agreement between her and HHC refers to "work days" and not "calendar days," such that under the Agreement HHC is "only entitled to recoup the monies equal to work days paid and not to calendar days." Id. ¶ 44.

On November 27, 2006, after discovery between the parties, HHC filed a motion for summary judgment and for leave to amend its answer to add a counterclaim pursuant to Fed. R. Civ. P. 13(f). HHC's counterclaim seeks to recoup the $146,771 it alleges that Woodard owes it under HHC's interpretation of the Agreement. HHC seeks summary judgment on all three of Woodard's claims and HHC's own counterclaim pursuant to Fed. R. Civ. P. 56. These motions are currently before this court for disposition.

### Legal Standards Under USERRA

USERRA prohibits discrimination against persons based upon their military service.  <u>See</u> 38 U.S.C. § 4301(a).  It was enacted to protect service members from "disadvantages to their civilian careers as a result of such service." <u>Curby v. Archon</u>, 216 F.3d 549, 556 (6th Cir. 2000).  The statute is applicable to both reservists and non-reservists.  38 U.S.C.  §4303(13); <u>Warren v. International Business Machines Corp.</u>, 358 F. Supp. 2d 301, 309 (S.D.N.Y. 2005).  Congress passed USERRA in 1994 to "clarify, simplify, and, where necessary, strengthen the existing veterans' employment and reemployment rights provisions." <u>Gummo v. Vill. of Depew</u>, 75 F.3d 98, 105 (2d Cir. 1996).  As with its predecessor, the Veterans Readjustment Assistance Act (VRAA) of 1974, USERRA is to be "broadly construed in favor of its military beneficiaries." <u>Hill v. Michelin North America, Inc.</u>, 252 F.3d 307, 312-3 (4th Cir. 2001); <u>see also</u> <u>McGuire v. United Parcel Service</u>, 152 F.3d 673, 676 (7th Cir. 1998).

### A.   Anti-Discrimination Protections (Section 4311)

USERRA's anti-discrimination provision is found in § 4311,

which provides: "A person who is a member of . . . a uniformed
service shall not be denied initial employment, reemployment,
retention in employment, promotion, or any benefit of employment
by any employer on the basis of that membership." 38 U.S.C.
§ 4311(a). USERRA defines "benefit of employment" broadly as
"any advantage, profit, privilege, gain, status, account, or
interest (other than wages or salary for work performed) that
accrues by reason of an employment contract or agreement." 38
U.S.C. § 4303(2). See also Maxfield v. Cintas Corp. No. 2, 427
F.3d 544, 551 (8th Cir. 2005). For the purposes of USERRA, a
loss of a benefit of employment under § 4311(a) constitutes an
adverse employment action, so long as the loss is material. See
Schmauch v. Honda of America Manufacturing, Inc., 295 F. Supp. 2d
823, 839 (S.D.N.Y. 2003); Grosjean v. FirstEnergy, 481 F. Supp.
2d 878, 884 (N.D. Ohio 2007).

An employer engages in a prohibited act under § 4311 "if the
person's membership . . . in the uniformed services is a
motivating factor in the employer's action, unless the employer
can prove that the action would have been taken in the absence of
such membership." U.S.C. § 4311(c)(1). Section 4311(c) was
enacted in response to the Supreme Court's ruling in Monroe v.
Standard Oil Co., 452 U.S. 549 (1981), in which the Court held
that under the VRRA, allegations of discrimination in employment
based upon military service could be proven only if the employee

could establish that the discrimination was "motivated <u>solely</u> by reserve status." <u>Monroe</u>, 452 U.S. at 559 (emphasis added). USERRA liberalized this requirement by providing that a violation could be established if the individual's military service was a "motivating factor" in the discriminatory action, even if it was not the only factor. <u>Sheehan v. Dep't of Navy</u>, 240 F.3d 1009, 1012-13 (Fed. Cir. 2001); <u>Gummo</u>, 75 F.3d at 106-7. In doing so, Congress "intended to lessen, but not eliminate, a veteran's obligation to show that the employer's adverse decision was related to his or her service in the armed forces." <u>Curby</u>, 216 F.3d at 557.

The appropriate framework for analyzing USERRA claims is the two-pronged burden-shifting analysis of <u>NLRB v. Transportation Management Corp.</u>, 462 U.S. 393 (1983). <u>See</u> <u>Fink v. City of New York</u>, 129 F. Supp. 2d 511, 520 (E.D.N.Y. 2001) (citing <u>Gummo</u>, 75 F.3d at 106). Under this framework, the employee alleging discrimination "bear[s] the initial burden of showing by a preponderance of the evidence that the employee's military service was 'a substantial or motivating factor' in the adverse employment action." <u>Sheehan</u>, 240 F.3d at 1013 (quoting <u>NLRB</u>, 462 U.S. at 400-01). <u>See also</u> <u>Gummo</u>, 75 F.3d at 106.[13]

---

[13] The <u>NLRB</u> two-pronged framework is distinct from the three-pronged <u>McDonnell Douglas</u> framework used in Title VII suits. Under the latter test, the burden of persuasion always remains on the employee. Once a case of discrimination is established by the employee, the employer must only put forward

"Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration."  <u>Fink</u>, 129 F. Supp. 2d at 520 (quoting <u>Robinson v. Morris Moore Chevrolet-Buick, Inc.</u>, 974 F. Supp. 571, 576 (E.D. Tex. 1997)).  "The term 'motivating factor' means that if the employer was asked at the moment of the decision what its reasons were and if it gave a truthful response, one of those reasons would be the employee's military position or related obligations." <u>Robinson</u>, 974 F. Supp. at 576. Discriminatory motivation may be proven through direct or circumstantial evidence, including but not limited to

> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proferred reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

<u>Sheehan</u>, 240 F.3d at 1014.

Once the employee proves that his military status served as a motivating factor in the employer's adverse decision, "the

---

"some legitimate, non-discriminatory reason" for its action. <u>McDonnell Douglas Corp. v. Green</u>, 411, U.S. 792, 802 (1973).  The burden is then transferred back to the employee to prove that the employer's reason is a pretext for its true motives.  <u>See</u> <u>Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.</u>, 473 F.3d 11, 17 (1st Cir. 2007); <u>Fink v. City of New York</u>, 129 F. Supp 2d at 519-20.  Under the <u>NLRB</u> framework, the burden of persuasion shifts to the employer; as such, "the burden of proof cast upon the employer to explain the discrimination is procedurally greater under the <u>NLRB</u> test." <u>Fink</u>, 129 F. Supp. 2d at 520.

employer may nonetheless escape liability by showing, as an affirmative defense, that it would have made the same decision without regard to the employee's protected status." _Fink_, 129 F. Supp. 2d at 520 (quoting _Gummo_, 75 F.3d at 106). _See also_ _Sheehan_, 240 F.3d at 1014. Both the burden of production and the burden of persuasion shift to the employer under this framework. _Maxfield_, 427 F.3d at 551. Thus, the employer cannot merely point to other grounds upon which its adverse action would have been justified. Rather, the employer must prove, as an affirmative defense, that it would have taken the same action based on the other reasons alone, without regard to the employee's protected status. _See Leisek v. Brightwood Corp._, 278 F.3d 895, 899 (9th Cir. 2002); _Sheehan_, 240 F.3d at 1013; _Gummo_, 75 F.3d at 106.

**B.    Reemployment Protections (Sections 4312 and 4313)**

In addition to its anti-discrimination protections, USERRA also creates an entitlement to reemployment upon return from military service.[14] USERRA provides that an individual who

---

[14] The statute, 38 U.S.C. § 4312(a), provides that:

[A]ny person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other rights and benefits of this chapter if (1) the person . . . has given advance written or verbal notice of such service to such person's employer; (2) the cumulative length of the absence . . . by reason of service does not

returns from a period of service greater than 90 days shall be promptly reemployed "in the position of employment which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service or a position of like seniority, status, and pay, the duties of which the person is qualified to perform." 38 U.S.C. § 4313(a)(2)(A). See also Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 305 (Fed. Cir. 2006).

Section 4313(a)(2)(A) defines the rights provided by § 4312 to service members returning to their previous employer. See Francis, 452 F.3d 299 at 305. In combination, the two sections of USERRA serve to alert service members and employers alike that, so long as members of the military meet § 4312's three criteria, they are entitled to their previous position of employment or a position of like seniority, status and pay upon completing their military duties.[15] See Francis, 452 F.3d at 304. Courts have interpreted both § 4312 and § 4313 as providing service members with only a right to immediate reemployment; they

_____

exceed five years; and (3) . . . the person reports to, or submits an application for reemployment to, such employer" within a specific period of time following the completion of military service.

[15] There are exceptions to this rule. Even if the returning service member satisfies § 4312(a)'s criteria, the employer is not required to rehire the person if reemployment is impossible or unreasonable, or if it would impose an undue hardship on the employer. 38 U.S.C. § 4312(d)(1)(A-B).

do not prohibit an employer from taking subsequent adverse employment actions, which would be addressed by other sections of the Act. See Francis, 452 F.3d at 305 (holding that "§ 4312 applies to protect a covered individual only as to the act of rehiring"); Jordan v. Air Products and Chemicals, Inc., 225 F. Supp. 2d 1206, 1208 (C.D. Cal. 2002).

The entitlement to reemployment created by § 4312 does not require a returning employee to show any evidence of discrimination. See Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 304 (4th Cir. 2006) (finding that section 4312 "guarantee[s] service persons' reemployment without question as to the employer's intent" (quoting Jordan v. Air Prods. & Chems., Inc., 225 F. Supp. 2d 1206, 1208 (C.D. Cal. 2002))); Wrigglesworth v. Brumbaugh, 121 F. Supp. 2d 1126, 1132 (D. Mich. 2000) (holding that section 4312 creates an entitlement of reemployment that does not require proof of discrimination); 20 CFR § 1002.33 (2006) ("The employee is not required to prove that the employer discriminated against him or her because of the employee's uniformed service in order to be eligible for reemployment.").[16]

---

[16] There was previously some dispute over whether a plaintiff was in fact required to prove discrimination in order to bring a reemployment claim under § 4312. The Sixth Circuit, in Curby v. Archon, 216 F.3d 549, 557 (6th Cir. 2000), held that § 4312 should be read as a "subsection" of USERRA section 4311 and, therefore, that a plaintiff bringing a claim under § 4312 "thus had the burden of showing that his military service was a

## Leave to Amend to Add Counterclaim

Rule 13(f) of the Federal Rules of Civil Procedure provides that a party may amend its pleadings to add a counterclaim if the pleader failed to assert the claim in his original pleading due to "oversight, inadvertence, or excusable neglect, or when justice so requires."  Fed. R. Civ. P. 13(f).  This rule must be read in conjunction with the liberal standard of Rule 15(a) of the Federal Rules of Civil Procedure, which states that leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  <u>See</u> <u>Banco Para El Comercio Exterior De Cuba v. First Nat'l. City Bank</u>, 744 F.2d 237, 243 (2d Cir. 1981); <u>Pfeffer v. Mark</u>, No. 98-CV-6771, 2000 WL 516891, at *1 (E.D.N.Y., Mar 16, 2000).  Leave to amend should be denied only if there is a good

---

motivating factor in the [employer's] decision not to reemploy him at the same level of work he enjoyed when he gave notice of his departure for military service."  This analysis was convincingly rejected by the <u>Francis</u>, <u>Jordan</u> and <u>Wrigglesworth</u> cases cited above.  These cases considered the structure and legislative history of USERRA to show that § 4311 and § 4312 provide separate rights for service members – the former protecting against discrimination, and the latter creating an entitlement to reemployment.  <u>See</u> <u>Francis</u>, 452 F.3d at 304; <u>Jordan</u>, 225 F. Supp. 2d at 1207; <u>Wrigglesworth</u>, 121 F. Supp. 2d at 1135.

This debate should be put to rest by the Department of Labor's December 2005 promulgation of its final USERRA regulations, in which the Department explicitly rejected the <u>Curby</u> analysis and stated that "a person seeking relief under section 4312 need not meet the additional burden of proof requirements for discrimination cases brought under section 4311."  70 Fed. Reg. 75246, 75251 (Dec. 19, 2005) (Department of Labor explanation of final rules implementing USERRA).

reason such as undue delay, bad faith or dilatory motive on the part of the movant, a futile claim, or undue prejudice to the opposing party.  <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962); <u>Min Jin v. Metro. Life Ins. Co.</u>, 310 F.3d 84, 101 (2d Cir. 2002); <u>Rachman Bag Company v. Liberty Mutual Ins. Co.</u>, 46 F.3d 230, 234 (2d Cir. 1994).

HHC seeks to add a counterclaim to recoup $146,771 owed by Woodard pursuant to the Agreement.  HHC asserts that granting leave to amend would serve "the goals of economy of the court and the parties" because resolution of Woodard's own contract claim requires the court to calculate the amount HHC is due.  Mem. Of Law in Supp. Of Def.'s Mot. For Leave to Amend Its Answer and for Summ. J. ("Def.'s Mem.") at 3.  In opposing this motion, Woodard charges that HHC unduly delayed in filing this claim by "sitting on its hands" until the "eve of trial," and that Woodard herself would suffer prejudice if leave to amend is granted.  Pl.'s Mem. Of Law in Opp. To Def.'s Mot. For Partial Summ. J. ("Pl.'s Mem.") at 14.

However, it is recognized law in the Second Circuit that delay alone, without some evidence of bad faith or prejudice to the other party, is generally not enough to warrant denial of a motion to amend.  <u>See</u> <u>Rachman</u>, 46 F.3d at 234-5; <u>State Teachers Retirement Bd. v. Fluor Corp.</u>, 654 F.2d 843, 856 (2d Cir. 1981); <u>UMG Recordings, Inc. v. Lindor</u>, No. 05-CV1095, 2006 WL 3335048,

at *3 (E.D.N.Y., Nov. 9, 2006). Because Woodard has offered no evidence of bad faith or prejudice, leave to amend should be granted.

Woodard claims that the court should abstain from hearing HHC's proposed claim because over two years passed between the filing of Woodard's complaint and HHC's motion to add the counterclaim. But HHC correctly points out that the counterclaim was unnecessary at the time of the complaint, because Woodard was an HHC employee at the time, and HHC had the ability to seek repayment without resort to legal channels. Woodard has offered no evidence to suggest that HHC's subsequent delay in amending to add this counterclaim was motivated by any form of bad faith.

Woodard also fails to show that she would suffer any prejudice from the timing of the amendment. When evaluating whether a party would suffer prejudice as the result of the assertion of a new claim, a trial court must determine whether the new claim will "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." UMG Recordings, 2006 WL 3335048, at *4 (quoting Block v. First Blood Associates, 988 F.2d 344, 350 (2d Cir. 1993)). Woodard, however, fails to submit any particularized evidence, other than general pronouncements that

she will be unduly prejudiced, of how she would suffer as a result of permitting HHC to amend its answer. HHC contends, and Woodard does not refute, that no additional discovery is required for resolution of its claim, as Woodard's own claim will likely yield a determination of the merits of HHC's proposed counterclaim. Nor is there any evidence that granting leave to amend will delay the resolution of this dispute. Therefore, leave to amend should be granted.

Woodard also raises the affirmative defense of laches against HHC's proposed counterclaim. Laches is premised not merely on the passage of time, but upon changes in the relationships or conditions of the parties that occurred during the period of delay. To successfully assert laches as a defense against a proposed claim, a party must prove that the claimant unreasonably delayed in raising the claim, and that the opposing party would suffer prejudice as a result. See <u>Merrill Lynch Investment Managers v. Optibase, Ltd.</u>, 337 F.3d 125, 132 (2d Cir. 2003); <u>Robbins Island Preservation Fund, Inc., v. Southold Dev. Corp.</u>, 959 F.2d 409, 423 (2d Cir. 1992). Under the doctrine of laches, a party suffers prejudice when it would be inequitable, in light of a change in the party's position, to allow the claim to proceed, or where the delay makes it difficult to garner evidence to vindicate the party's rights. <u>Robbins Island</u>, 959 F.2d at 424.

45

Woodard's laches argument fails because she has failed to even allege that she has suffered any prejudice as a result of the delay. Of course, such allegations would be baseless, because the parties have in fact been litigating their dispute over the repayment agreement throughout these proceedings. The proposed counterclaim does not raise any new issues, but merely represents an attempt by HHC to collect the money it claims to be owed. Accordingly, Woodard's laches defense has no merit.

### (3)

### First Cause of Action: Discrimination Claim

Woodard's first cause of action alleges that HHC discriminated against her in the form of a "reduced pay increase" that was inconsistent with a raise "awarded to similarly situated non-military employees." Compl. ¶ 19. She claims that this decision was made "as a result of" the "negative evaluation" she received from Jacobs. Id. Plaintiff seeks the balance of the raise, retroactive to the day it went into effect, plus interest she lost out on and any other "appropriate statutory penalties." Id. ¶ 21.

In order to succeed on this claim, Woodard must prove that the "reduced pay increase" constituted an adverse employment action, and that her military service was a "motivating factor" in HHC's decision not to award her an 8% raise. See 38 U.S.C.

§ 4311(c); <u>Fink</u>, 129 F. Supp. 2d at 520. Woodard has raised a material question of fact about whether HHC would have taken the same actions if it had not considered her military leave. But HHC should, nonetheless, be granted summary judgment on Woodard's first cause of action, because HHC has shown that it awarded a full and retroactive pay increase to Woodard in 2004, rendering this claim moot.

Under the two-pronged analysis for a USERRA discrimination claim (explained more fully above), Woodard has the initial burden of establishing by a preponderance of the evidence that her military status was a "motivating factor" in an employer's adverse employment decision. <u>Fink</u>, 129 F. Supp. 2d at 520 (citing <u>Gummo</u>, 75 F.3d at 106). Woodard can meet this initial burden, because she has provided sufficient evidence to suggest that her employer's September 2001 evaluations improperly considered her military service, and that these considerations led to a deferral of her 4% pay increase.

Woodard has testified that her supervisor, Caroline Jacobs, "screamed" at her on September 13, 2001 because Woodard's imminent military leave was going to interfere with the scheduling of hospital surveys. Woodard Dep. at 52. Two weeks later, Jacobs issued a performance evaluation dated September 28, 2001, which stated that Woodard was only being given a six-month evaluation "due to leaves (military and FMLA)." Def.'s Ex. N at

11.  Dunn, the Senior VP in charge of pay increase decisions,
recommended in a September 27, 2001 memorandum that Woodard only
receive a 4% raise at that time because "[a]side from her two
leaves of absences, Ms. Woodard has only worked for six months in
the Office of Accreditation and Regulatory Services, not
providing adequate time to appropriately evaluate her
performance."  Def.'s Ex. P.  The temporal proximity of these
events, and the fact that Dunn referred to both of Woodard's
leaves of absence in his memo, is sufficient to create an
inference that Woodard's military status was a motivating factor
in this decision.  See Sheehan, 240 F.3d at 1014 ("Discriminatory
motivation under the USERRA may be reasonably inferred from a
variety of factors, including proximity in time between the
employee's military activity and the adverse employment action .
. . .");  Fink, 129 F. Supp. 2d at 520 (explaining that
"[m]ilitary status is a motivating factor if the defendant relied
on, took into account, considered, or conditioned its decision on
that consideration" (quoting Robinson v. Morris-Moore Chevrolet-
Buick, Inc., 974 F. Supp. 571, 576 (E.D. Tex. 1997))).[17]

_____

[17] Woodard also claims that other similarly situated
employees who worked at HHC for less than a year received an 8%
raise.  Woodard has alleged that Maureen Cress ("Cress") and Beth
Reinstein, who she says also served under Dunn, each received 8%
increases despite not having worked in their positions for a full
year.  Woodard Dep. at 82.  Woodard believes that Cress began
working in OARS in October or November of 2000.  Id. at 83.  If
true, this would mean that Cress was only working in Woodard's
division for eight or nine months before Fiscal Year 2001 ended

48

Although Woodard has met her burden of proof, her employer "may nonetheless escape liability by showing, as an affirmative defense, that it would have made the same decision without regard to the employee's protected status." Fink, 129 F. Supp. 2d at 520 (quoting Gummo, 75 F.3d at 106). Here, HHC claims that its decision would have been the same, regardless of Woodard's military service, because it was based entirely on the childcare leave that Woodard took from February 16, 2001 to September 4, 2001. HHC's primary proof for this claim is the testimony of Dr. Dunn, who made the pay raise decision. Dunn testified that he based his decision solely on the fact that Woodard's supervisor could not perform an adequate one-year review because Woodard "had not been there a year because she was out on family medical leave." Dunn Dep. at 18.

However, Dunn's testimony is contradicted by other facts in the record. Dunn claimed at his deposition that he had not learned of Woodard's military leave until after he made the decision to grant her a 4% pay increase. See Dunn Dep. 16-18. Specifically, Dunn claimed that he had learned of Woodard's military leave from Jacobs' evaluation, which was dated September

---

on June 30, 2001, which was the period that the one-year evaluations covered. Plaintiff's counsel raises these allegations in plaintiff's opposition brief, but without any evidentiary support besides Woodard's own deposition testimony, despite the fact that the parties engaged in over a year of discovery before briefing this summary judgment motion.

28, 2001.  Def.'s Ex. N.  Although Dunn's September 27, 2001 memo makes no reference to a military leave, it does refer to Woodard's "two leaves of absences."  Def.'s Ex. P.  Construing these facts in the light most favorable to plaintiff, this evidence creates a reasonable inference that Dunn was aware of both Woodard's military leaves and her February-to-September 2001 FMLA leave when he made the pay increase decision.

Other than Dunn's testimony, HHC has failed to provide sufficient evidence to prove that the decision to deny Woodard her full 8% pay increase would have been made regardless of her military leave.  The references to Woodard's military leave in Jacobs' evaluation suggest that HHC improperly considered Woodard's military leave as time away from work, in violation of USERRA's "escalator" principle.  See 20 C.F.R. § 1002.191 ("[USERRA's] escalator principle requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of [military] service.").  In light of this principle, Jacobs' evaluation for the period starting on July 5, 2000 should have evaluated Woodard for the seven-and-a-half months she worked until her FMLA leave began on February 16, 2001, and should not have taken into account the three weeks of military leave she took in July 2000 or the week of military leave she took in January 2001.

Critically, under the NLRB test, the burden of production and persuasion rests with HHC at this juncture. In light of that burden, HHC has failed to provide sufficient evidence to prove that it would have given Woodard a six-month evaluation, rather than a one-year evaluation and the full pay increase, even if it had not considered the four weeks of military leave that Woodard had taken during the review period starting July 5, 2000. More importantly, HHC has failed to prove that the denial of the pay increase might not have been affected by the fact that Woodard was about to leave for another military leave at the time her performance was evaluated and the decision was made. In short, a material issue of fact remains as to whether HHC would have made the same decision for an employee who had just returned from a six-month childcare leave, but who had not previously taken military leave and who was not about to return to military service.

However, although Woodard alleged in her complaint that she never received the additional 4% pay increase, the record clearly shows that she did in fact receive a retroactive 4% raise upon returning to HHC in 2004. This salary increase was awarded to her on May 21, 2004, and it was implemented retroactive to September 4, 2001, the date upon which she returned from FMLA leave. Def.'s Ex. B; Yan Decl. at ¶ 4. As a result, Woodard's salary was increased from $77,740 to $80,850 per year. Def.'s

Ex. B; Yan Decl. at ¶ 4.  In accordance with this raise, Woodard

was paid $8,266.38 in back pay for the period during which she

was on military leave.  Yan Decl. at ¶ 4 & Ex. 1.  This amount

represented the additional 4% she was owed from that period.  As

such, HHC argues that Woodard's claim is moot.

HHC is correct.  Woodard's claim is moot because, following

the retroactive pay increase awarded to her in 2004, there is no

injury that remains to be redressed here.  The remedies available

under USERRA include injunctive relief and compensatory damages

in the form of lost wages and benefits.  <u>See</u> 38 U.S.C.

§ 4323(d)(1)(A)-(B).  These remedies allow a court to ensure that

employers comply with the provisions of USERRA, and to make an

employee whole when those provisions are violated.  USERRA also

provides an additional "liquidated damages" remedy that can

double a plaintiff's compensatory damages to punish an employer's

willful misconduct.  38 U.S.C. § 4323(d)(1)(C).  <u>See also</u>

<u>Schmauch v. Honda of Am. Mfg.</u>, 311 F. Supp. 2d 631, 635 (S.D.

Ohio 2003) (explaining USERRA's remedial scheme).  But USERRA

does not provide for any other punitive damages or statutory

penalties.  <u>See</u> <u>Morris-Hayes v. Bd. of Educ.</u>, 423 F.3d 153, 160

(2d Cir. 2005) (holding that a Section 1983 suit for damages is

unavailable to enforce the rights created by USERRA, because

"USERRA provides a comprehensive remedial scheme to ensure the

employment and reemployment rights of those called upon to serve

in the armed forces of the United States"); <u>Schmauch</u>, 311 F. Supp. 2d at 636 (concluding that public policy tort claim for punitive damages is precluded by USERRA's comprehensive remedial scheme). Because plaintiff has pointed to no remedy that would be available to her, even if the court found that HHC had discriminated against her by deferring her pay increase on account of her military service, plaintiff's first cause of action must be dismissed as moot.[18]

### (4)

### Second Cause of Action: Reemployment Claim

Woodard admits that HHC reemployed her upon her return from military service. It is also undisputed that, upon returning to HHC, Woodard retained the same managerial title and salary as in the past, albeit in a different role. Woodard alleges that HHC violated USERRA by failing to reemploy her in a position of similar status. However, because the evidence shows that HHC reemployed Woodard in a job with similar status, which utilized her existing skills and qualifications, defendant is entitled to

---

[18] When asked at her deposition about what damages she suffered by the delay in her 4% increase, Woodard claimed that she had been denied the interest or investment income she could have made from this additional income between 2001 and 2004. Woodard Dep. at 177-78. Even if that purported loss could create an actionable injury, it is fully mitigated by the interest and investment opportunities Woodard would have accrued by collecting a full salary from HHC on top of her military pay during that same period of time.

summary judgment on this claim as well.

As noted, USERRA creates an entitlement to reemployment for returning servicemembers. Under section 4312, returning military personnel who (a) gave advance notice of military leave to their employer; (b) were on a military leave of less than five years; and (c) submitted a timely request for reemployment "shall be entitled" to reemployment. 38 U.S.C. § 4312. Woodard complied with all of these requirements. Therefore, USERRA provides that she was entitled to reemployment "in the position of employment which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service or a position of like seniority, status, and pay, the duties of which the person is qualified to perform." 38 U.S.C. § 4313(a)(2)(A).

HHC met this requirement by promptly reemploying Woodard in a position of equivalent seniority, status and pay that took advantage of her existing qualifications. Although Woodard argues that her new role was not of the same status, there is uncontroverted evidence in the record to show that her job as an Associate Director in the QMCA office remained a "managerial" position. While Woodard may sincerely believe that her new role was secretarial not managerial, the testimony of her supervisors and co-workers shows that secretaries were not permitted to handle Woodard's new responsibilities, because a secretary would

not have the analytical skills or knowledge to prepare the quality assurance reports.  Woodard shared her responsibilities with her supervisor Dr. Dungca and other co-workers, all of whom were also managerial-level employees.  Woodard took over some of these responsibilities from Esther Schwartz, who was described by DeOcampo as a senior management consultant.  Woodard was herself replaced by a nurse holding a Ph.D. degree when she left the job.  All of this evidence establishes beyond any doubt the managerial status of Woodard's new role.

As already noted, central to USERRA's reemployment protections is the "escalator principle," which "requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of [military] service."  20 C.F.R. § 1002.191.  This principle, however, permits an employer to take into consideration changes in the workplace during an employee's period of military leave.  The USERRA regulations recognize that an employer's reemployment offer may be affected by changes in staffing or work priorities, so long as the returning employee maintains the seniority and job classification she would have held if she been employed during her period of military service.  See 20 C.F.R. § 1002.194 ("The reemployment position may involve transfer to another shift or location, more or less strenuous

working conditions, or changed opportunities for advancement, depending upon the application of the escalator principle.).  See also Long v. Ellis Environmental Group, LC, No. 3:05cv227, 2007 WL 1020005, at *6 (N.D. Fla. Mar. 30, 2007) (granting summary judgment to employer on § 4312 claim because employee was offered reemployment in a position of similar seniority, pay and status; employer was permitted to offer a job that differed from employee's pre-service job, because the job shift was made necessary by changes in employer's staff and business during the period of military service).

In this case, HHC has shown that the change in Woodard's responsibilities was based solely on the legitimate staffing needs of HHC's Medical and Professional Affairs Division, which includes both OARS and QMCA.  Plaintiff describes her previous job at OARS as "checking on Doctors credentials, determining cleanliness of the facilities, and the facilities' compliance with the appropriate rules and regulations" by conducting surveys at these facilities "on a seasonal basis."  Pl.'s Mem. at 3. Through this work, Woodard assured the quality of patient care by collecting information on a facility-by-facility basis.  At her new job in QMCA, Woodard was "responsible for the quality assurance committee agenda, minutes, and communicating with facilities."  Id. at 9.  In other words, Woodard continued to protect the quality of patient care, by coordinating and managing

information from multiple facilities and preparing that information for review by HHC's Board of Directors. Both jobs were equally critical to HHC's mission of improving patient care, and both jobs required a staff member with the same level of skill and expertise in quality assurance issues.

There is no dispute that the two positions carried the same pay and seniority. Moreover, based on this undisputed record, a jury verdict finding an objective difference in status in the two positions could not stand. Because these jobs were of "like seniority, status and pay," HHC fully complied with the reemployment requirements of §§ 4312 and 4313.

Woodard also claims that HHC "penalized" her for her military service by changing her job responsibilities. If true, this claim would constitute a violation of USERRA's protections against discrimination in reemployment. See 38 U.S.C. § 4311(a). But the record establishes that HHC's decision to assign Woodard to the Quality Assurance division was based solely on the corporation's legitimate staffing needs, and was not discriminatory as Woodard claims. According to the deposition testimony of Dunn and Jacobs, HHC was operating on a very tight budget that prevented new hiring. Therefore, Dunn was moving qualified employees, including Woodard, as needed to ensure that critical roles at the corporation were filled. Although Woodard's old position had been held open for her while she was

on military leave – a fact which itself tends to undermine her
reemployment claim – other OARS employees had taken on all of
Woodard's old responsibilities without complaint, essentially
causing her old job to disappear.[19]  In contrast, the QMCA office
was short three employees and severely understaffed, requiring
Dunn to assign Woodard to this division upon her return.  Even in
light of the employer's burden of proof under the two-pronged
NLRB test, HHC is entitled to judgment as a matter of law on this
reemployment claim, because Woodard can point to no facts that
challenge HHC's bona fide explanation for its employment
decision.  See Gummo, 75 F.3d at 106 ("[T]he employer may
nonetheless escape liability by showing, as an affirmative
defense, that it would have made the same decision without regard
to the employee's protected status.") (citing NLRB, 462 U.S. at
401).

    Woodard's complaint makes two specific claims for how she
was injured by her reassignment.  First, she alleges that the
change in the nature of her duties "has had and will continue to
have a detrimental effect on the Plaintiff's ability to be
promoted by the Defendant."  Compl. ¶ 30.  But Woodard has
provided no evidence that HHC was displeased with her performance

---

    [19] Notably, while Woodard was never replaced in OARS on
either a temporary or permanent basis, Dunn continued to reassign
other HHC employees to ensure that Woodard's QMCA job remained
filled when she left for a temporary (and subsequently permanent)
leave of absence.

in QMCA, and in fact the record suggests the opposite. Morever, after Woodard worked in QMCA for five months she took a personal healthcare leave under FMLA, followed by an additional extended military leave, after which her employment with HHC was terminated.[20] Because Woodard only worked at QMCA for five months, any claim about the effect of this job on her future promotion opportunities is purely speculative.

Second, Woodard alleges that her job change "has also reduced the Plaintiff's marketability for jobs outside of the Defendants's agency." Compl. ¶ 31. But Woodard admitted at her deposition that she had not looked for a new job since leaving HHC. Therefore, this claim is also based solely on Woodard's speculative allegations, and has no evidentiary support. It is well established that "[m]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." Conroy v. N.Y. State Dep't of Corr. Servs., 333 F.3d 88, 94 (2d Cir. 2003).

In short, the record shows that HHC reemployed Woodard in a position of like seniority, status and pay. Although the reemployment position differed from Woodard's prior position, it remained a managerial-level job that took advantage of Woodard's

---

[20] The record does not indicate why Woodard's employment was terminated, but there are no allegations that the termination was prompted by her military service. See Woodard Dep. at 148-49; Pl.'s Mem. at 12.

skills and qualifications.  The job change was due solely to
workplace changes that occurred during Woodard's period of
military service.  Woodard has failed to offer any evidence to
show that HHC treated her any differently than it treated
employees of similar seniority and job classification, or that it
violated USERRA's escalator principle by failing to provide her
with the seniority and privileges she would have accrued during
her time of military leave.  Therefore, HHC is entitled to
summary judgment on Woodard's reemployment claim.


**(5)**

### Third Cause of Action and Counterclaim: Military Pay
### Reimbursement Agreement

Plaintiff's third cause of action contests the amount of
money that Woodard owes HHC under the Military Pay Reimbursement
Agreement.  Specifically, plaintiff's third cause of action
"requests a finding by this court that, under the letter contract
and the course of conduct between the parties, that the Defendant
is only entitled to recoup the monies equal to work days paid and
not to calendar days."  Compl. ¶ 44.

As explained in the summary of facts, the parties agree that
Woodard owes HHC some portion of the salary she was paid during
her military service under the terms of the Agreement.  But the
parties dispute the meaning of language in the Agreement signed
by Woodard which stated that she would "remit to the New York

City Health and Hospitals Corporation an amount equal to the amount I receive in military pay or HHC salary, whichever is less, for any _days_ in excess of the statutory entitlement of thirty calendar days or twenty-two workdays." Def.'s Ex. Z (emphasis added).

HHC argues that the word "days" in this contract refers to "calendar days." HHC argues that the recoupment amount should be calculated by comparing Woodard's military salary with her HHC salary over the same calendar period. Under this interpretation of the word "days," Woodard must repay to HHC all military income she received for all days while away from HHC (minus her statutory entitlement to the greater of thirty calendar days or twenty-two workdays). Based on this calculation, HHC told Woodard she owed $144,141.98. Compl. ¶ 41.

Woodard, however, claims that the word "days" is never defined in this Agreement, and that the HHC's calculations should be based on "work days" instead of "calendar days." Compl. ¶¶ 38-39. Plaintiff claims that her HHC and military salaries are not directly comparable, because at HHC she only worked seven hours a day and five days a week, whereas "every day in the military is a work day and every hour is a work hour." Compl. ¶ 40. In a series of creative but ultimately unpersuasive calculations, Woodard has broken down her military pay into an hourly rate (based on the presumption that she works twenty-four

hours a day and seven days a week while in the military). Def.'s Ex. MM. Woodard then concluded that she only needed to reimburse HHC for thirty-five hours a week of this purported hourly wage. In other words, Woodard argues that any military pay earned outside of her normal thirty-five hour work week is hers to retain and that HHC is not entitled to recoup it. Based on these calculations, Woodard alleges that she only owes HHC $60,522.24 in extended benefits pay.

"The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." <u>Omni Quartz v. CVS Corp.</u>, 287 F.3d 61, 64 (2d Cir. 2002). "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." <u>Greenfield v. Philles Records, Inc.</u>, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170-71, 750 N.Y.S.2d 565, 569-70 (2002) (internal punctuation and citations omitted). Because the unambiguous language of this contract can only be reasonably read to support HHC's interpretation, HHC is entitled to summary judgment on this claim.

Plaintiff is attempting to generate ambiguity about the meaning of this contract, but her interpretation of the contract has no basis. The meaning of the Agreement is clear. By signing

the Agreement, Woodard gained the benefit of receiving her full
HHC salary and benefits while she was on military duty.  In
exchange, Woodard agreed that she would later repay the lesser of
her military pay or HHC salary "for any days" that she received
both salaries during her period of military leave.  The only
reasonable interpretation of this agreement was that in exchange
for receiving a daily salary from HHC on top of her daily pay in
the military, she would someday have to pay one of those sums
back.

Woodard was a salaried employee who did not receive an
hourly wage for her work at HHC or as a member of the United
States Army Reserve.  Therefore, there is no basis for comparing
her work at HHC and in the military on an hour-by-hour basis.
Under any reasonable interpretation of the Agreement, Woodard's
relative salary in both positions must be calculated by placing
comparable salary periods side by side, as HHC has appropriately
done.  See Def.'s Ex. OO.

Even if Woodard was right that there is some ambiguity in
the contract, all of the extrinsic evidence in the record
supports HHC's interpretation.  See MSF Holding Ltd. v. Fiduciary
Trust Co. Int'l, 435 F. Supp. 2d 285, 302 (S.D.N.Y. 2006) ("A
court's review of evidence extrinsic to the terms of a contract
itself is permissible on a summary judgment motion where, as
here, such evidence demonstrates that no genuine issue of

material fact exists.").  The City of New York voluntarily
created the EMBP program after the attacks of September 11, 2001
to allow City employees to continue to collect two salaries, from
their City job and from the military, for any period of active
military service.  In exchange for receiving this double salary
and full benefits while on military leave, employees agreed to
remit the lesser of those two salaries to the employer City
agency after the conclusion of their military duty.  <u>See</u> Pl.'s
Ex. 5 (New York City press release (Nov. 10, 2006)) ("Employees
who sign up for EMBP agree to pay back to the City the lesser of
the two salaries upon their return to avoid 'double-dipping.'").

The military benefits policy also created an exception to
this "double-dipping" reimbursement requirement, stating that
employees were permitted to keep both salaries for a period of
thirty calendar days, or twenty-two working days, as allowed by
New York Military Law § 242.  <u>See</u> Def.'s Ex. X (HHC Operating
Procedure 20-15 explaining "Leave of Absence for Military Duty").
Plaintiff appears to believe that, because HHC distinguished
between calendar days and working days for the purpose of
calculating the length of her military leave, a similar
distinction should apply to the salary reimbursement
calculations.  <u>See</u> Compl. ¶¶ 35-36.  But the method of
calculating the length of an employee's military leave has no
bearing on the salary calculations required under the repayment

agreement.

The record also shows that HHC consistently calculated Woodard's salary on a "calendar day" basis. For example, the internal memorandum regarding the back pay owed to Woodard after her retroactive 4% pay increase calculated that back pay on a "calendar day" basis. See Def.'s Ex. T (Memo from John K. Yan to Gloria Velez, (July 9, 2004)). This calculation, from an unrelated payroll context, is fully consistent with HHC's calculation of the sum owed by Woodard under the military benefits agreement. See Def.'s Ex. NN (email from John Yan to Gloria Velez, (May 3, 2004)); Ex. OO (HHC worksheets explaining calculation of salary owed by Woodard).

For these reasons, HHC is entitled to summary judgment on Woodard's third cause of action. HHC is also entitled to summary judgment on its counterclaim seeking recoupment of the money owed under the Agreement.

However, there seems to be some discrepancy between HHC's various calculations of the proper amount. HHC's memorandum of law claims that "plaintiff owes approximately $146,771 — the entire amount of military pay she received less approximately $3600 that HHC recouped by deducting 10% from her paychecks during her employment." Def.'s Mem. at 6. This amount is apparently based on a recalculation made by HHC in June 2005, which added "$6,213.25 in extended military pay benefits overpaid

to plaintiff." <u>Compare</u> Yan Decl. at ¶ 5 & Ex. 2 (showing current calculation), <u>with</u> Def.'s Ex. OO (showing prior calculation crediting plaintiff for "30 calendar days military leave benefit" in both 2002 and 2003). In fairness to plaintiff, who has not had an opportunity to challenge this calculation, she is entitled to rely on HHCs's earlier claim of $144,141.98 for the period of military leave, minus the $3,583.91 that was already recovered through payroll deductions. <u>See</u> Yan Decl. at ¶ 5.[21]

Therefore, HHC is entitled to recoup a total of $140,558.07. Any objections to this amount must be filed in a timely motion for reconsideration pursuant to Local Rule 6.3.

---

[21] Woodard also claims that HHC is trying to recoup money that was part of her food and housing allowance, in violation of City policy. But the record shows that HHC has only sought repayment of the base military pay Woodard received during her military leave. <u>See</u> Yan Decl.; Def.'s Ex. NN (E-mail from Gloria Velez to John Yan (May 3, 2004)); Def.'s Ex. OO (Memorandum from John Yan to Gloria Velez (July 6, 2004)). This was true both before and after Mayor Bloomberg announced on November 10, 2006 that the City would no longer seek to recoup military food and housing allowances under the EMBP. <u>See</u> Pl.'s Ex. 5.

## Conclusion

In conclusion, defendant is granted summary judgment on all of plaintiff's claims.  Defendant is granted leave to amend its answer to add the proposed counterclaim, and is granted summary judgment on that counterclaim in the amount of $140,558.07.


Dated: Brooklyn, New York
       March 17, 2008

                          SO ORDERED:


                          _____/s/_____
                          David G. Trager
                          United States District Judge