UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
HILLAIRE WOODARD,

       Plaintiff,                          <u>MEMORANDUM AND ORDER</u>

   -against-                                Civil Action No.
                                            04-CV-5297(DGT)
NEW YORK HEALTH AND HOSPITALS
CORPORATION,

       Defendant.

-------------------------------X

Trager, J:

     Plaintiff Hillaire Woodard ("Woodard") brought this case

against defendant New York City Health and Hospitals Corporation

("HHC"), her ex-employer, on December 6, 2004.  She alleged

discrimination by HHC in violation of the Uniformed Services

Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C.

§ 4301 <u>et seq.</u>, and disputed the amount of money she owes HHC in

repayment under a Military Pay Reimbursement Agreement (the

"Reimbursement Agreement" or "the Agreement") made between them.

HHC asserted a counterclaim for the money it believed Woodard

owed it under its interpretation of the Agreement.

     Summary judgment was granted to HHC on Woodard's claims and

HHC's counterclaim on March 17, 2008.  Woodard appealed, and the

Second Circuit issued a Summary Order in October 2009 affirming

in part and remanding in part.  First, the Second Circuit

affirmed that Woodard's USERRA discrimination claims were

properly dismissed.  Second, the Second Circuit affirmed that
the Reimbursement Agreement was properly interpreted to require
repayment of Woodard's full military salary during the period
where she was receiving both HHC and military salary.  However,
on appeal, Woodard also argued that New York's newly-enacted
Military Law § 242(5-a), which, <u>inter alia</u>, reduces the amount
of repayment that employees of New York City have to make under
military reimbursement agreements, affects the amount of her
repayment obligation to HHC.  Rather than addressing this issue
in the first instance, the Second Circuit remanded for
consideration of two questions: (1) Does N.Y. Milit. Law
§ 242(5-a) apply to HHC employees?; and (2) If so, what effect
does this have on the amount that Woodard owes HHC under the
Reimbursement Agreement?  Additionally, the Second Circuit
instructed that Woodard could, on remand, challenge this Court's
previous calculation of the amount she owes HHC under the
Agreement.

The parties have briefed the questions presented.  Having
considered these submissions, it is now determined that N.Y.
Milit. Law § 242(5-a) does not apply to HHC employees, and,
therefore, has no effect on the amount that Woodard owes HHC
under the Reimbursement Agreement.  Furthermore, although
Woodard raises new challenges to the Reimbursement Agreement and
section 242(5-a) under USERRA and the Equal Protection Clause,

these challenges are without merit.  Finally, as Woodard raises

no specific challenge to this Court's initial calculation of the

amount she owes HHC under the Agreement, the amount HHC is

entitled to recoup from Woodard remains as $140,558.07.


**Background**

Familiarity with the underlying facts of this case, as set

forth in Woodard v. New York Health and Hosps. Corp., 554 F.

Supp. 2d 329 (E.D.N.Y. 2008) ("Woodard I"), is presumed.  Those

facts of particular relevance to the questions now presented are

set forth below.

As of 2001, Woodard worked for HHC as the Associate

Director of Health Care Standards in HHC's Office of

Accreditation and Regulatory Services.  Woodard I, 554 F. Supp.

2d at 334.  Woodard began military leave from this position at

HHC on October 22, 2001.  At this time, HHC and New York City

(the "City") had a policy of granting employees on military

leave only the statutorily-required "twenty-two workdays or

thirty calendar days of paid military leave."  See id. at 335,

339; see also N.Y. Milit. Law § 242(5).[1]  The precise

---

[1] N.Y. Milit. Law § 242(5) requires this paid leave time for all
public officers or employees of the state and its subdivisions:

> **Pay for military duty.** Every public officer or
> employee shall be paid his salary or other
> compensation as such public officer or employee for

relationship between HHC and the City, and the extent to which their leave policies should be considered separate or intertwined, are very much in dispute in this case and will be discussed at length _infra_.  However, as the following facts illustrate, it is at least clear that around the time Woodard went on military leave, the City and HHC made independent decisions to revise their military leave policies.

Following the September 11, 2001 World Trade Center attacks, the City decided to adopt a more generous military leave policy.  In October 2001, the City announced the creation of its Extended Military Benefits Package (the "City EMBP"), which allowed "City employee reservists to continue to receive the City's salary and benefits when they are called to active duty for more than 30 calendar days or 22 working days," in addition to receiving their military salary and benefits during this time.  Affirmation of Gary Port in Supp. of Pl.'s Mem. Law Opp. Def.'s Mot. Partial Summ. J., Jan. 29, 2007 ("Port Aff.") Ex. 5 at 2 (City press release detailing modifications to City EMBP program).  This change allowed reservists to continue coverage under the City's health benefits, which were more

---

        any and all periods of absence while engaged in the
        performance of ordered military duty, and while going
        to and returning from such duty, not exceeding a total
        of thirty days or twenty-two working days, whichever
        is greater, in any one calendar year and not exceeding
        thirty days or twenty-two working days, whichever is
        greater, in any one continuous period of such absence.

generous than the military's, and also allowed them to continue to accrue City pension and welfare fund benefits during their absence.  Id.  However, to avoid "double-dipping," employees who signed up for the City EMBP were required "to pay back to the City the lesser of the two salaries [military or City] upon their return . . . ."  Id.

In November 2001, soon after the City adopted the City EMBP, HHC followed suit by amending its own personnel regulations to create an "Extended Military Benefits Program" (the "HHC EMBP").  See Aff. of Nancy Doyle in Supp. of Def.'s Mem. Law on Remand from the Second Circuit ("Doyle Aff.") Ex. A. The HHC EMBP was, if not identical, at least substantially similar to the City EMBP as outlined above.  Thus, under the HHC EMBP, an employee was entitled to receive his or her entire HHC salary during periods of military leave, subject to the condition that the employee had to agree to remit the lesser of either military pay or HHC salary at the conclusion of service, excepting the thirty calendar days of double pay to which employees were statutorily entitled.  See Woodard I, 554 F. Supp. 2d at 339-40; Doyle Aff. Ex. A.

Shortly after the HHC EMBP policy was introduced, Woodard opted into it and signed the Reimbursement Agreement at issue. See Aff. of Alan R. Friedman in Supp. of Def.'s Mem. Law on Remand from the Second Circuit ("Friedman Aff.") Ex. A (copy of

the Reimbursement Agreement signed by Woodard on Nov. 19, 2001). The Agreement provided that Woodard would receive both her military pay and her HHC salary during her military leave, but would be required "to remit to the New York City Health and Hospitals Corporation an amount equal to the amount [she] receive[d] in military pay* or salary, whichever [was] less, for any days in excess of the statutory entitlement of thirty calendar days or twenty-two work days within thirty days after the conclusion of ordered military leave."[2]  Id.

In 2004, at the conclusion of Woodard's military service, HHC reminded Woodard of the terms of the Reimbursement Agreement and presented her with an accounting of the money she owed.  Per initial calculations made by HHC's Director of Corporate Payroll Operations, John K. Yan ("Yan"), HHC informed Woodard in July 2004 that she owed $137,052.97 to HHC.  Woodard I, 554 F. Supp. 2d at 345; Friedman Aff. Ex. D.  This amount included:

| (1) | $144,141.98 | Military pay received between 11/25/01 and 2/28/04 (the total time Woodard was on leave, except for thirty days at the beginning of |

[2] The asterisk indicated that "[m]ilitary pay is defined as the amount of base pay plus allowances for food and shelter." Friedman Aff. Ex. A.  The City later amended its EMPB plan to exclude food and shelter allowances, see Woodard I, 554 F. Supp. 2d at 340 n.9; it is not clear whether HHC followed suit and officially amended its own policy.  However, HHC has explained that it has not sought to recover reimbursements for Woodard's allowances for food and shelter, but only for her basic military pay.  See Decl. John Yan Further Supp. Def.'s Mot. Summ. J. ("Yan Decl.") ¶¶ 5-6.

|       |   |              |                                                                                     |
|-------|---|--------------|-------------------------------------------------------------------------------------|
|       |   |              | her leave, during which she was entitled to receive both military pay and HHC salary) |
| (2)   | + | $6,213.25    | "Extended military benefits overpaid," dated 2/29/04 – 3/27/04                       |
| (3)   | - | $6,645.21    | "30 Calendar Days Military Leave Benefit 10/22/02 - 11/20/02"                        |
| (4)   | - | $6,657.05    | "30 Calendar Days Military Leave Benefit 10/22/03 - 11/20/03"                        |
| (5)   | = | **$137,052.97** | **Total Amount Owed**                                                            |

Friedman Aff. Ex. D. at 7. However, this calculation erroneously included two extra thirty-day periods of double pay (rows (3) and (4) above) – one for each calendar year of Woodard's absence. In actuality, Woodard was only entitled to one thirty-day period in which she received both HHC salary and military pay during her entire period of continuous military service.[3] <u>Woodard I</u>, 554 F. Supp. 2d at 345 n.11; <u>see also</u> N.Y. Milit. Law. § 242(5). Consequently, the amount of money owed by Woodard to HHC was recalculated in June 2005 as $146,771.32. Doyle Aff. Ex. C at 7. This amount broke down to:

| (1)   | $144,141.98 | Military pay received between 11/25/01 and 2/28/04 (the total time Woodard was on leave, except for thirty days at the beginning of her leave, during which she was entitled to receive both military |
|-------|-------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|

---

[3] This first period of thirty days of double pay, to which no one disputes Woodard was entitled, appears to be accounted for in row (1) of the chart above, as Woodard began military leave on October 22, 2001, <u>Woodard I</u>, 554 F. Supp. 2d at 339, but was not charged with remitting her military pay until November 25, 2001.

|     |   |            |                                                         |
|-----|---|------------|---------------------------------------------------------|
|     |   |            | pay and HHC salary)                                     |
| (2) | + | $6,213.25  | "Extended military benefits overpaid," dated 2/29/04 – 3/27/04 |
| (3) | - | $3,583.91  | "Recoupment: 9/10/04 - 1/28/05"                        |
| (4) | = | **$146,771.32** | **Total Amount Owed**                              |

Id. In contrast to the first calculation, this calculation excluded the 2002 and 2003 thirty-day periods of double pay, and included $3,583.91 that Woodard had made in payroll deduction payments (row (3)) between the dates of the two calculations. Compare id., with Friedman Aff. Ex. D at 7. Notably, "[t]he revised figure [did] not take into account Woodard's housing or food allowances while on military leave." Woodard I, 554 F. Supp. 2d at 346 (citing Yan Decl. at ¶¶ 5-6).

Woodard, while not disputing that she owed HHC some reimbursement, contested the process used to arrive at this amount. In brief, she argued first to HHC and then to this Court that the phrase "for any days" in the Reimbursement Agreement meant she only had to reimburse HHC "for any work days" for which she was double-paid. Accordingly, by her logic, because she worked for HHC five days a week, seven hours a day, but worked for the military seven days a week, twenty-four hours a day, she only owed to HHC that portion of her military salary that she was paid during hours she otherwise would have been working for HHC – i.e., a pro-rated portion of her total

military pay.  *See* *id.* at 345.  She initially figured this
amount to be $60,522.24, though later suggested this estimate
should be lower once she understood that it should include only
military base pay, not housing and food allowances.  *Id.*

On  November 27, 2006, HHC moved for summary judgment on
Woodard's USERRA claims and on the issue of the proper
interpretation of the Reimbursement Agreement, and also asserted
a counterclaim seeking to recover the $146,771 it believed
Woodard owed it under HHC's interpretation of the Agreement.
*Id.* at 347.  Summary judgment was granted to HHC on all of
Woodard's claims and on HHC's counterclaim on March 17, 2008.
*Id.* at 360.  On the issue of how to interpret the Reimbursement
Agreement, it was determined that the plain language of the
contract unambiguously required Woodard to repay to HHC the
entirety of her military salary for those days where she
received double salary.  *Id.* at 358-59.  However, it was noted
that there was "some discrepancy between HHC's various
calculations of the proper amount" owed under the Agreement.
*Id.* at 360.  Therefore, this Court explained: "In fairness to
plaintiff, who has not had an opportunity to challenge this
calculation, she is entitled to rely on HHC's earlier claim of
$144,141.98 for the period of military leave, minus the
$3,583.91 that was already recovered through payroll
deductions," amounting to $140,558.07.  *Id.*

Plaintiff appealed this determination to the Second Circuit, which issued a Summary Order on October 29, 2009, affirming in part and remanding in part. First, it affirmed that "the Agreement unambiguously requires Woodard to repay the entirety of the lesser of her two salaries – in her case, her military salary." Woodard v. New York Health and Hosps. Corp., 350 Fed. App'x 586, 588 (2d Cir. 2009) ("Woodard II"). However, the Second Circuit questioned this Court's finding as to the amount Woodard owed HHC under the Agreement, noting that there was "some confusion" in this regard: Woodard I explained that it arrived at the figure of $140,558.07 by allowing Woodard to rely on HHC's initial, lower calculation of the amount Woodard owed HHC. However, as illustrated supra p. 7, this initial, lower calculation made by HHC was not $144,141.98, as was stated in Woodard I, but $137,052.97. See Woodard II, 350 Fed. App'x at 589. Given this confusion, and further given that Woodard was, at the time, proceeding pro se, the Second Circuit instructed that she was free on remand to challenge this Court's calculation of the amount she owes HHC under the agreement. Id.

Moreover, Woodard argued on appeal that New York Military Law § 242(5-a), which went into effect after Woodard I, has an impact on the repayment amount she owes HHC. That provision reduces by fifteen percent the amount of repayment that City employees who opted to participate in the City EMBP plan are

10

obligated to make upon their return. <u>See</u> N.Y. Milit. Law § 242(5-a)(e) (McKinney's 2010). Consequently, if subsection (5-a) applies to HHC employees – as Woodard contends – she will only be required to repay eighty-five percent of the amount she owes HHC under the Reimbursement Agreement. The Second Circuit remanded for this question to be considered in the first instance here.

**Discussion**

**(1)**

**Applicability of New York Military Law § 242(5-a) to HHC**

The first issue on remand – the question of whether N.Y. Milit. Law § 242(5-a) applies to HHC – requires interpretation of this New York statute. When a federal court is faced with "resolving a dispute over the interpretation of a New York statute, [it] must 'endeavor to predict how the highest court of the state' would resolve the issue." <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, No. CV-00-4923, 2002 WL 31946762, at *9 (E.D.N.Y. Nov. 21, 2002) (quoting <u>U.S. E. Telecomms., Inc. v. U.S. W. Commc'ns Servs., Inc.</u>, 38 F.3d 1289, 1296 (2d Cir. 1994)). "When the New York Court of Appeals interprets a New York statute, that interpretation is binding on federal courts, just as if it had been written by the State legislature itself." <u>Besser v. Walsh</u>, No. CV-02-6775, 2003 WL 22093477, at *24

(S.D.N.Y. Sept. 10, 2003).  However, when no decision by New York's highest court directly speaks to an issue of statutory interpretation, both relevant rulings of other courts of the state and relevant cases from other jurisdictions can help guide the determination of how the statute should be interpreted.  See Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 119 (2d Cir. 1994).

Neither the New York Court of Appeals nor any lower New York court has had occasion to consider whether N.Y. Milit. Law § 242(5-a) applies to HHC.  However, given past New York precedent regarding HHC's status and the plain language of section 242(5-a), it appears that the New York courts would not, if faced with the issue, find subsection 5-a applicable to HHC, for the reasons explained below.

**a. The Language of Section 242(5-a)**

Like federal courts, New York courts approach the question of statutory interpretation with the "primary consideration" of "ascertain[ing] and giv[ing] effect to the intention of the Legislature."  DaimlerChrysler Corp. v. Spitzer, 7 N.Y.3d 653, 660, 860 N.E.2d 705, 708, 827 N.Y.S.2d 88, 91 (2006).  The statutory language is treated as "the clearest indicator of legislative intent," and thus New York courts "construe

unambiguous language to give effect to its plain meaning." Id.;
see also N.Y. Stats. § 94 (McKinney's 2010).

There is no real disagreement here that section 242(5-a) is
a provision designed to aid New York City employees serving in
the military.  The subsection states: "This subdivision shall
govern the calculation of compensation and, where applicable,
repayment of same by public officers or employees of a city with
a population of one million or more who are engaged in the
performance of ordered military duty . . . ." § 242(5-a).[4]  The
subsection goes on to define "[p]ublic officer" or "employee" as
"a public officer or an employee of a city." Id. (5-a)(a)(x).
Sub-subsection (e) then sets forth the rule at issue here:

> A public officer or employee who, prior to the
> effective date of this subdivision, elected to
> participate in a "full pay/repayment plan" and, in
> having done so, incurred a repayment obligation, shall
> make repayments in accordance with terms adopted by
> the implementing agency, except that, with respect to
> such repayment obligations, such officer or employee
> shall have satisfied the obligation to repay when he
> or she has repaid eighty-five percent of the amount of
> city salary or military salary, whichever is less . .
> . .

§ 242(5-a)(e).  This clause unambiguously permits any New York
City employee, who has incurred an obligation to pay back the

---

[4] As HHC notes, New York City is the only city in New York with a
population of over one million, and thus the only city subject
to section 242(5-a).  See Def.'s Mem. Law on Remand from the
Second Circuit ("Def.'s Mem.") at 9.

City for salary accrued while on military leave, to pay back

only eighty-five percent of what he or she would otherwise owe.

However, the question remains whether section 242(5-a)

applies to HHC employees in particular.  The answer to this

question turns upon a determination of whether HHC employees

should be considered "public officer[s] or . . . employee[s] of

a city" who are thereby covered by the statute.  Section 242(5-

a) gives no guidance on this front.[5]  It is, therefore, necessary

to move beyond section 242(5-a)'s language to determine whether

---

[5] As HHC has noted, an amendment has been proposed to
section 242(5-a) that would explicitly add "employees of the New
York city health and hospitals corporation" to the list of those
covered by the provision.  See 2009 N.Y. Senate Bill No. 5747
(introduced June 3, 2009).  Although this subsequent legislative
history would be only weak evidence under federal law of the
intent of a prior legislature, New York courts appear more
amenable to considering subsequent legislative history.  Compare
Pena v. Robles, 12 Misc. 3d 1163(A), 819 N.Y.S.2d 211 (Table)
2006 WL 1524612, at *13 (Sup. Ct. N.Y. County May 19, 2006)
("While the [New York] Court of Appeals . . . cautions that
relying on statements subsequent to the passage of legislation
should be avoided in determining what was intended by a statute
adopted by the Legislature, subsequent legislative  actions may
be helpful in determining what the Legislature intended in an
earlier act . . . ."), and Transcon. Gas Pipe Line Corp. v. New
York City Tax Appeals Tribunal, 240 A.D.2d 252, 252, 659
N.Y.S.2d 732, 733 (1st Dep't 1997) (examining subsequent
legislative history to determine the legislative intent behind
an earlier amendment), with Jones v. United States, 526 U.S.
227, 238 (1999) ("[S]ubsequent legislative history is a
hazardous basis for inferring the intent of an earlier
Congress." (internal quotation marks omitted)).  Thus, this
proposed amendment further supports HHC's interpretation that
section 242(5-a)'s current language does not include HHC
employees – otherwise, there would be no need for an amendment
to add HHC employees to the list of covered employees.

HHC employees are included within the category of "public
officer[s] or employee[s]" of the City.

**b. Whether HHC Employees are City Employees**

   HHC contends that it is well-settled that HHC employees are
not City employees, but rather employees of an independent state
entity, and that, therefore, section 242(5-a) is inapplicable.
In response, Woodard concedes that HHC has previously been
labeled as a separate entity from the City, but argues that the
City and HHC have occasionally been treated as one entity and
should be considered the same for purposes of section 242(5-a).
However, in spite of the one line of cases cited by Woodard –
distinguishable for reasons discussed below – the statutory
provisions governing HHC and New York courts' interpretation of
these provisions unambiguously demonstrate that HHC employees
are not City employees.

   HHC is a public benefit corporation that was established by
state statute in 1969.  See N.Y. Unconsol. Laws § 7381 et seq.
(the "HHC Act").  The language of the HHC Act makes clear that
it is an entity separate and apart from the City.  Created in
response to an "inadequacy and shortage of health facilities,"
the HHC Act charges HHC with the mission of taking over City
hospitals in order to better provide medical and health services
to the City's residents.  See N.Y. Unconsol. Laws § 7382.  To

this end, the HHC Act directs the City to turn over the operation of all hospitals and medical facilities to HHC, and further instructs the City to appropriate funds from each fiscal year to pay HHC for the services it provides. N.Y. Unconsol. Laws § 7386.

The separation envisioned between HHC employees and City employees is made specific in subsequent sections. Critically, the HHC Act instructs HHC to promulgate its own rules and regulations regarding personnel matters, separate and apart from the City's regulations. N.Y. Unconsol. Laws § 7390.[6] Moreover, a provision of the HHC Act proves for the transfer of City employees to HHC:

> Every employee who was an employee of the administration, or any constituent agency or department thereof, shall be automatically appointed and transferred to the corporation in the same or equivalent classification and position he held at the time of such transfer and for such purposes <u>the corporation shall be deemed the successor to the city as a public employer of such employee.</u>

---

[6] At one point, Woodard argues that "HHC is subject to the regulations set forth by the city's department of personnel and civil services commission." Submission of Pl. on Remand from the Second Circuit ("Pl.'s Mem.") at 13. However, this was only the case in the brief period before HHC adopted its own personnel regulations. The HHC Act specifies that HHC was only subject to New York City's personnel rules and regulations "[u]ntil the corporation adopt[ed] by-laws, rules and regulations relating to personnel administration . . . ." N.Y. Unconsol. Laws § 7390.

N.Y. Unconsol. Laws § 7390(2)(a) (emphasis added). This language, labeling HHC as the "successor to the city as a public employer," quite obviously infers that HHC is a separate employer from the City. When coupled with the HHC Act's instruction to HHC to adopt its own personnel rules and regulations, this provision "clearly demonstrates that [HHC] was intended to function as an independent entity in every regard and was to have complete autonomy respecting its personnel." Vaughn v. City of New York, 108 Misc. 2d 994, 998, 438 N.Y.S.2d 156, 159-60 (Sup. Ct. N.Y. County 1980).

The conclusion that the HHC Act unambiguously deems HHC employees separate from City employees has been reinforced by the New York Court of Appeals, which made clear that HHC is not generally an agency of the city, but rather is a separate state entity. See Brennan v. City of New York, 59 N.Y.2d 791, 792, 451 N.E.2d 478, 479, 464 N.Y.S.2d 731, 732 (1983). However, as Brennan recognized, there is one exception to this rule: for purposes of representation and indemnification, HHC is considered a City agency. Id. at 792.

Woodard seizes upon this exception to argue that because HHC and the City are at times treated as a single entity, they should be so treated here. In support, she cites primarily to Philippeaux v. N. Cent. Bronx Hosp., 871 F. Supp. 640, 649 (S.D.N.Y. 1994) ("Philippeaux I"). In that case, the plaintiff

brought a Title VII discrimination suit against HHC and the
City, but only named HHC in his complaint filed with the Equal
Employment Opportunity Commission ("EEOC"). Id. at 649.
Therefore, the City argued that the suit against it could not
proceed, as being named in an EEOC complaint is a prerequisite
to being subject to suit. Id. at 649-50. Philippeaux I held
that the City was still subject to suit on an "identity of
interests" theory: because HHC was entitled to legal
representation and indemnification by the City for acts
performed by HHC employees in the scope of their employment, the
two were considered functionally equivalent for Title VII
purposes. Id.

    HHC is correct, however, that Philippeaux I was later
overruled by another opinion in that same case. After it was
determined that the City did not represent HHC in front of the
EEOC and that HHC promulgated its own personnel regulations, it
was held that in fact there was not a sufficient "identity of
interests" between the two. See Philippeaux v. N. Central Bronx
Hosp., No. CV-94-3409, Order of Oct. 18, 1995, at 5-6 (S.D.N.Y.
1995); aff'd, 104 F.3d 353, 1996 WL 680758, at *2 (2d Cir. Nov.
22, 1996) (Table case) (finding district court properly
dismissed the City as a party because there was no identity of
interests between the City and HHC).

Indeed, most Title VII cases have reached the conclusion that despite the fact that HHC employees are entitled to indemnification and representation by the City, HHC and the City are separate entities with separate employees. See Samuel v. Bellevue Hosp. Ctr., No. CV-08-4635, 2010 WL 537725, at *1 n.** (2d Cir. Feb. 17, 2010) ("[HHC] is separate and distinct from the City of New York."); Springer v. City of New York, No. CV-01-4392, 2006 WL 526028, at *9 (E.D.N.Y. March 3, 2006) (Trager, J.) (finding no identity of interests between HHC and the City in a Title VII case); Harris v. City of New York, No. CV-03-1593, 2006 WL 2034446, at *2 (E.D.N.Y. July 17, 2006) (same); Centeno v. New York City, No. CV-02-2745, 2005 WL 1126811, at *4 n.5 (E.D.N.Y. May 12, 2005) (explaining, in dicta, that "the City of New York is not plaintiff's employer and cannot be held liable in this Title VII action [because] [t]he City of New York and the Health and Hospitals Corporation are separate legal entities"). But see Jadoo v. City of New York, No. CV-95-3540, 1997 WL 614508, at *4 (E.D.N.Y. Sept. 29, 1997) (citing Philippeaux I and finding an "identity of interests" between the City and HHC in the Title VII context).

Even crediting plaintiff's assertion that the City and HHC may have an identity of interests for Title VII purposes, any such identity of interests has been explicitly limited to the context of representation and indemnification. See Brennan, 59

19

N.Y.2d at 792 ("[F]or purposes other than representation and indemnification [HHC] is not an agency of the city.")  Thus, as numerous New York opinions have recognized, HHC's separate identity adheres in matters of personnel and HHC employees are not employees of the City.  See HHC v. Council of the City of New York, 303 A.D.2d 69, 79, 752 N.Y.S.2d 665, 673 (1st Dep't 2003) (finding that the City Council could not pass a law restricting HHC hiring because HHC was designed to have "complete autonomy over its personnel"); Haynes v. Giuliani, 238 A.D.2d 257, 258, 657 N.Y.S.2d 18, 19 (1st Dep't 1997) ("[HHC] is an entity separate and distinct from the City of New York with complete autonomy respecting its personnel and, accordingly, should not be deemed an 'agency' within the meaning of Local Laws . . . ." (internal quotation marks and citations omitted)); Vaughn, 108 Misc. 2d at 999 ("[T]he fact that HHC was or is contractually engaged in providing services for the City as an independent contractor does not make an employee of HHC into an employee of the City."); see also Binyard v. City of New York, 151 A.D.2d 712, 712, 543 N.Y.S.2d 145, 145 (2d Dep't 1989); Davis v. City of New York, 10 Misc.3d 234, 238, 805 N.Y.S.2d 800, 803 (Sup. Ct. N.Y. County 2005).

In sum, there exists considerable evidence that HHC employees are intended to be distinct from City employees. First, there is the statutory power vested in HHC to control its

own personnel and the statutory language deeming HHC the successor in interest to the City as a public employer.  Second, there is the New York Court of Appeal's explicit finding that HHC is <u>not</u> an agency of the City outside of the context of representation and indemnification.  Finally, there are multiple New York opinions and federal opinions finding that HHC employees are not City employees.  Given this evidence, it seems clear that if faced with the question of whether HHC employees are "employees of a city" for purposes of section 242(5-a), the New York Court of Appeals would answer in the negative.

Therefore, N.Y. Military Law § 242(5-a), which by its terms applies only to City employees, does not apply to HHC employees like Woodard.


**(2)**

**Alleged USERRA and Equal Protection Clause Violations**

Woodard next raises the argument that if N.Y. Milit. Law § 242(5-a) is interpreted not to apply to HHC employees, it then violates USERRA and the Equal Protection Clause of the Constitution.  Essentially, Woodard's argument is that giving the benefit of section 242(5-a) to City government employees, but not to other government employees, impermissibly discriminates against this latter class.  This argument is without merit.

First, this argument does not present a colorable USERRA claim.  To establish USERRA discrimination, a person must show she was denied a benefit of employment on the basis of military service.  See 38 U.S.C. § 4311(a) (2006); see also Gummo v. Vill. of Depew, 75 F.3d 98, 105 (2d Cir. 1996) ("USERRA was designed to '[c]ontinue to prohibit discrimination or acts of reprisal against an employee . . . because of a past, current, or future military obligation.'" (quoting H.R. Rep. No. 103-65(I), at 18 (1994), reprinted in 1994 U.S.C.C.A.N. 2449, 2451)); Staub v. Proctor Hosp., 560 F.3d 647, 655 (7th Cir. 2009) ("Like other employment discrimination legislation, USERRA prohibits adverse action based on a prohibited criterion, in this case military status."), cert. granted, 30 S. Ct. 2089 (2010).  However, Woodard does not claim that she was treated differently on the basis of her military status or service.  Rather, she claims disparity in how employees of various governmental entities are treated after returning from military service.  Accordingly, an allegation that section 242(5-a) treats HHC employees serving in the military differently than City employees serving in the military cannot properly be cast as a USERRA claim, because the differential treatment is motivated by the relevant employer, not military status.  Cf. McDuffie v. Eli Lilly and Co., No. CV-04-05995, 2009 WL 857069, at *8 (S.D.N.Y. March 31, 2009) (dismissing a USERRA claim where

the plaintiff "proffered no direct evidence that anything of which he complains was motivated even in part by his military status" and there was "no evidence of expressions of hostility toward the protected class"); Brady v. Calyon Secs. (USA), No. CV-05-3470, 2007 WL 4440926, at *16 (S.D.N.Y. Dec. 17, 2007) (finding that a USERRA claim failed because the plaintiff "provided absolutely no evidence that he was discriminated against on the basis of his military status").

Woodard alternately proceeds on the theory that section 242(5-a) violates the Equal Protection Clause of the Constitution. The Fourteenth Amendment prohibits any State from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To evaluate whether a Fourteenth Amendment violation exists, it must first be determined whether a state law discriminates against a "suspect" classification of persons, in which case it is subjected to heightened judicial scrutiny. See Pyke v. Cuomo, 567 F.3d 74, 77 (2d Cir. 2009). In contrast, if no suspect classification is implicated, the challenged legislation is reviewed under the deferential rational basis standard, and the "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Town of Southold v. Town of E. Hampton, 477 F.3d 38,

54 (2d Cir. 2007) (quoting <u>City of Cleburne v. Cleburne Living</u> <u>Ctr., Inc.</u>, 473 U.S. 432, 440 (1985)).

Plaintiff's challenge does not implicate any suspect classification. Section 242(5-a) differentiates only between employees of different governmental authorities — a type of classification that does not demand heightened scrutiny. <u>See</u> <u>Connolly v. McCall</u>, 254 F.3d 36, 42 (2d Cir. 2001) (finding that an equal protection claim premised on "the disparity of treatment between New York state and local employees who previously worked for another state or local employer, and those who previously worked for a private employer, or a non-New York public employer" was to be evaluated under rational basis review); <u>Patrolmen's Benevolent Assoc. v. City of New York</u>, No. CV-02-3976, 2004 WL 3262798, at *6 (S.D.N.Y. Aug. 19, 2004) (finding that equal protection challenge alleging disparate treatment of employees of various city and state agencies did not implicate a suspect classification). Therefore, section 242(5-a) is accorded a presumption of validity, so long as there is some "conceivable state of facts that could provide a rational basis for the classification" it employs. <u>Heller v.</u> <u>Doe</u>, 509 U.S. 312, 319 (1993). Moreover, "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." <u>Id.</u> at 319-20 (internal

marks and citations omitted); see also Connolly, 254 F.3d at 42.
Woodard has not met this burden.

First, it should be noted that although plaintiff describes
the classification employed here as one between "city employees"
and "non-city governmental employees," see Pl.'s Mem. at 13, it
would be more accurate to label the classification as one
between City employees and HHC employees.  Neither party has
suggested that any governmental agency other than the City or
HHC has adopted an EMBP plan permitting double salary collection
during military leave with a subsequent repayment obligation.
As such, section 242(5-a), which modifies this type of repayment
obligation, could only have been written to apply, at its
broadest, to both the City and HHC.  It follows that the
relevant question, for purposes of reviewing this provision
under the Equal Protection Clause, is whether there is any
rational basis for the Legislature to have made section 242(5-a)
apply to the City, but not to HHC.

Although HHC does not proffer a rationale for the
Legislature's choice to apply section 242(5-a) only to City
employees, a reasonable explanation is imaginable.  See
Nordlinger v. Hahn, 505 U.S. 1, 15 (1992) ("[T]he Equal
Protection Clause does not demand for purposes of rational-basis
review that a legislature or governing decisionmaker actually
articulate at any time the purpose or rationale supporting its

classification."); <u>General Media Commc'ns, Inc. v. Cohen</u>, 131

F.3d 273, 286 n.16 (2d Cir. 1997) ("It is . . . irrelevant

whether the conceived reason for the challenged distinction

actually motivated the legislature so long as there is a

plausible reason for Congress' action." (internal marks

omitted)).  For example, it may be that the Legislature

determined that HHC funding constraints made it unwise to apply

section 242(5-a) to HHC.  In this vein, it must be noted that

the City wrote in support of the act that added section 242(5-a)

to the Military Law, and worked with the Legislature to craft

the legislation.  <u>See</u> Mem. in Supp. from the City of New York's

Office of the Mayor, Bill Jacket, L. 2008, ch. 238, at 22.[7]

Therefore, the Legislature could be sure that the City was

prepared to accept the loss of revenues that section 242(5-a)

would cause.  In contrast, the New York Legislature may have

determined that HHC's budgetary situation made a reduction of

employee repayments to HHC ill-advised.

Alternatively, the Legislature may have decided simply to

give HHC the deference typically accorded to it to design its

---

[7] Because the City adopted its EMBP on its own, not through the
State Legislature, it also could have amended it on its own.
<u>See</u> Division of the Budget Bill Memorandum, Bill Jacket, L.
2008, ch. 238, at 12 ("Since the City created the EMBP
administratively, changes to the program could be done without
statute.").  However, for reasons not entirely clear, the State
Legislature, with the support of the City, decided to revise the
City EMBP through an amendment to state law.

own personnel regulations.  The Legislature could have reasoned that just as HHC voluntarily created its initial EMBP following the City's model, it could choose to amend the HHC EMBP to conform to the changed City EMBP.  In so deciding, the Legislature may have concluded that HHC was in the best position to determine how a change in its EMBP policy might impact its critical operations.  Indeed, HHC argues that the specific reason that it has not opted into the changes imposed on the City by section 242(5-a) is that it worries about how its plan administrator would reconcile those changes with HHC rules regarding pension rights and benefits, and is afraid that the new rules might create a USERRA violation if applied improperly. See Doyle Aff. at ¶ 9.

Either of these conceivable reasons – concern over HHC's finances or deference to its ability to make its own personnel decisions – provides a rational basis for the distinction that section 242(5-a) draws between City employees and HHC employees. Therefore, Woodard's argument that section 242(5-a) violates the Equal Protection Clause is without merit.

### (3)

### The Reimbursement Agreement and USERRA

On remand, Woodard seeks to introduce a new argument as to why she should not be required to pay back the full amount she owes

under the Reimbursement Agreement.  Again, this takes the form

of an alleged USERRA violation: Woodard's contention is that

"charging Plaintiff for paid military leave during civilian non-

workdays violates USERRA."  Pl.'s Mem. at 9.

In response, HHC first asserts that this issue is outside the

scope of the Second Circuit's remand and therefore precluded by

the mandate rule.  The mandate rule, a "branch of the law-of-

the-case doctrine," holds that "where issues have been

explicitly or implicitly decided on appeal, the district court

is obliged, on remand, to follow the decision of the appellate

court."  Burrell v. United States, 467 F.3d 160, 165 (2d Cir.

2006).  "To determine whether an issue remains open for

reconsideration on remand, the trial court should look to both

the specific dictates of the remand order as well as the broader

'spirit of the mandate.'"  Id.  If the appellate court has made

either an explicit or implicit ruling on a matter, "the trial

court is barred from reconsidering or modifying any of its prior

decisions" regarding that matter.  Id.  The corollary to this

rule, though, is that "where a party raises an issue that was

not part of the appellate decision . . . a trial court may

consider the matter."  Kuhl v. United States, No. CV-07-3680,

2008 WL 4527744, at *5 (E.D.N.Y. Sept. 30, 2008) (internal

quotation marks omitted).

The mandate rule does not bar consideration of whether the
Reimbursement Agreement, as interpreted by the Second Circuit,
violates USERRA.  This issue was never raised prior to remand,
and, accordingly, was neither explicitly nor implicitly decided
by the Second Circuit.  To be sure, this argument could have
been – and should have been – made at an earlier stage in this
litigation.  However, it cannot be said that it would be outside
"the spirit of the mandate" to consider it at this point,
particularly as the Second Circuit was concerned with giving
Woodard, then a pro se plaintiff, an adequate chance to
challenge the amount of her repayment.  See Woodard II, 350 Fed.
App'x at 589; see also Lamar Adver. of Penn, LLC v. Town of
Orchard Park, No. CV-01-556, 2008 WL 781865, at *4 (W.D.N.Y.
Feb. 25, 2008) (explaining that a district court has "discretion
under the mandate rule to reconsider, on remand, issues that
were not expressly or implicitly decided" by an appellate ruling
(quoting United States v. Stanley, 54 F.3d 103, 107 (2d Cir.
1995)).  In any event, HHC should suffer no prejudice from
having this argument considered at this point, as it is
determined to be without merit, for the reasons explained below.

Woodard argues that the Reimbursement Agreement violates
USERRA by permitting HHC to recover her military salary for days
in which she would not have been required to work at HHC, had

she not been on leave.[8]  See Pl.'s Mem. at 8.  In particular,

Woodard points to the Federal Circuit's opinion in Butterbaugh

v. Department of Justice, 336 F.3d 1332 (Fed. Cir. 2003), as

evidence that USERRA should be interpreted to prohibit the

Reimbursement Agreement.  Butterbaugh dealt with the amount of

military leave due to certain federal employees whose leave was

governed by 5 U.S.C. § 6323(a)(1).[9]  The critical issue in

Butterbaugh was the proper interpretation of this provision –

§ 6323(a)(1) – under which it was determined that "fifteen days"

of military leave meant fifteen work days, not fifteen calendar

days.  Id. at 1337-39.  However, Butterbaugh specified that the

---

[8] Woodard's new argument that interpreting "days" to mean
"calendar days" violates USERRA is essentially a recasting of
her previous argument that the term "days," as used in the
Reimbursement Agreement, should be interpreted as meaning "work
days."  However, the argument has shifted from one of contract
interpretation to one of statutory interpretation: now that the
Second Circuit has affirmed that "days" in the Reimbursement
Agreement unambiguously means "calendar days," Woodard argues
that interpreting the Agreement in this fashion causes the
Agreement to violate USERRA's ban on denying members of the
military any benefit of employment.

[9] 5 U.S.C. § 6323(a)(1) provides, in relevant part:

> [A]n employee as defined by section 2105 of this title
> or an individual employed by the government of the
> District of Columbia, permanent or temporary
> indefinite, is entitled to leave . . . .  Leave under
> this subsection accrues for an employee or individual
> at the rate of 15 days per fiscal year and, to the
> extent that it is not used in a fiscal year,
> accumulates for use in the succeeding fiscal year
> until it totals 15 days at the beginning of a fiscal
> year.

determination of whether a USERRA violation had occurred specifically turned on its interpretation of § 6323, because "if the Department [of Justice] granted [petitioner employees] the full measure of leave due to them under section 6323(a)(1)," then the petitioners could not claim that they were denied a benefit of employment in violation of USERRA. Id. at 1336.

Butterbaugh is thus inapposite to Woodard's situation. The Second Circuit has already affirmed that "days" as used in the Reimbursement Agreement at issue here means "calendar days," and that the Agreement thus requires Woodard to pay back the entire military salary she received while on leave. See Woodard II, 350 Fed. App'x at 588; Woodard I, 554 F. Supp. 2d at 359. It appears that the essence of Woodard's argument is that Butterbaugh's finding that "days" as used in § 6323(a)(1) meant work days, not calendar days, means that somehow a finding to the contrary regarding the Reimbursement Agreement's plain language violates USERRA. However, Butterbaugh indicated that a USERRA violation would exist only if the petitioners were denied whatever benefit they were due under the proper interpretation of their governing military leave rules – in that case, § 6323. See 336 F.3d at 1336. By extension, under Butterbaugh's logic, Woodard can only claim she was denied a benefit of employment in violation of USERRA if she can show that HHC did not follow the proper interpretation of the Reimbursement Agreement. See

Welshans v. U.S. Postal Serv., 550 F.3d 1100, 1103 (Fed. Cir. 2008) (finding that Postal Service did not deny employee any benefit of USERRA because its military leave policy, which unlike § 6323 unambiguously included non-work days in its calculation, was properly followed).  Since it has already been determined that HHC's interpretation of the Reimbursement Agreement is correct, it follows that Woodard cannot show that HHC denied her any benefit of the Agreement.  See id.

    Woodard points to nothing else about the Reimbursement Agreement that might violate USERRA's prohibition on denying employment benefits on the basis of military service.  To the contrary, the Reimbursement Agreement confers a special benefit on employees serving in the military, by allowing them to receive double salaries during service on the condition that they repay the lesser one on return.  This voluntary policy, which employees can opt into if they consider it a benefit but otherwise are free to decline, does not violate USERRA.  "USERRA prohibits discrimination against reservists because of their service: there is nothing in the statute to prevent an agency from granting them benefits not available to other employees." Id. at 1104 (emphasis added).  Accordingly, plaintiff's new argument that the Agreement violates USERRA is without merit.

### Calculation of the Amount Owed

Having considered and rejected Woodard's arguments for striking or limiting the Reimbursement Agreement, it remains to be determined whether the calculation of the amount Woodard owes to HHC under the Agreement is correct. As the Second Circuit noted, the initial calculation made by this Court of the amount Woodard owes HHC was somewhat confusing. HHC submitted two separate calculations to Woodard of the amount she owed: one in July of 2004, where it was determined she owed HHC $137,052.97, and another in June 2005, which stated that she owed $150,355.23 less $3,583.91 already recouped from Woodard through payroll deductions. Compare Doyle Aff. Ex. C at 7, with Friedman Aff. Ex. D at 7. The additional $13,302.26 owed in the recalculation came from HHC's realization that it had initially erroneously credited Woodard with thirty days of double salary for each year she had been on leave, whereas she was in fact only entitled to one thirty-day period of double salary during her entire period of continued military service. See Woodard I, 554 F. Supp. 2d at 345 n.11.

In Woodard I, this Court stated that Woodard, having had no opportunity to challenge HHC's calculation, was "entitled to rely on [HHC's] earlier claim." Id. at 360. However, Woodard I then incorrectly charged Woodard with repaying $144,141.98 – an

amount in between HHC's first and second calculations – not HHC's earlier total claim of $137,052.97.[10] Id.

Woodard was, on remand, given a chance to challenge this Court's earlier calculation of the repayment amount, but has not presented any argument related to whether the figure should be HHC's first calculation of $137,052.97, its second calculation of $150,355.23 or this Court's calculation of $144,141.98.[11] HHC also appears content to have this Court's calculation of $144,141.98 stand as the amount owed to it under the Repayment Agreement, less $3,583.91 already recouped. Accordingly, given no challenge by either side to this figure, the amount owed by Woodard to HHC will remain as $140,558.07.

---

[10] This amount was not, however, drawn from thin air. This $144,141.98 figure was listed in each of HHC's calculations as the total "Basic Military Pay Received." See Doyle Aff. Ex. C at 7; Friedman Aff. Ex. D at 7.

[11] Woodard's one specific challenge to the repayment amount is her argument that HHC is only entitled to recoup basic military pay, not food and housing allowances. However, just as in Woodard I, plaintiff has put forward no evidence that HHC is seeking to recoup anything but basic military pay from her, and the record shows that HHC has only sought repayment of Woodard's basic military pay, not allowances. See Woodard I, 554 F. Supp. 2d at 360.

## Conclusion

For the reasons explained above, it is determined that N.Y. Milit. Law § 242(5-a) has no impact on the amount that Woodard owes to HHC under the Reimbursement Agreement. The amount Woodard owes to HHC on its counterclaim remains as $140,558.07.

Dated:  Brooklyn, New York
         July 7, 2010

                              SO ORDERED:

                              _____/s/_____
                              David G. Trager
                              United States District Judge